## CENTRAL GEORGIA LAND & LUMBER COMPANY *v.* EXCHANGE BANK OF MACON.

1. One who, on his own account, engages in the business of purchasing goods for the purpose of filling orders received by him from others, and who in fact fills the same at prices therein specified, looking for his profits to the difference between what he pays and what he receives in these transactions, is not, though in each instance the order is received before a purchase is made, the agent of the persons by whom the orders are given, but an independent dealer buying and selling in his own behalf.

2. Although such a dealer may have arranged generally with a bank to pay for all goods purchased by him in the course of such a business, upon an express agreement that upon so doing the bank was to have possession of and title to such goods until reimbursed for its advances by the payment of drafts drawn in its favor by the dealer upon his customers, the bank to honor his checks for the purchase-money, charging him therewith and crediting him with the proceeds of the drafts, yet where, in a particular instance, a purchase was made and the goods delivered to the dealer himself, the bank paying the price thereof upon his check without having obtained either actual or constructive possession of the goods or having had any dealings with the seller, the title passed to the dealer and the goods became subject to an existing judgment against him as against a claim by the bank.

3. This case differs from that of *Tuttle* v. *Exchange Bank*, 90 *Ga.* 653, and is not controlled by the decision therein rendered.

Argued February 27, — Decided June 10, 1897.

Levy and claim.  Before Judge Ross.  City court of Macon.  June term, 1896.

*Dessau & Hodges*, for plaintiff.
*Bacon, Miller & Brunson*, contra.

LUMPKIN, P. J.  At the instance of the Central Georgia Land & Lumber Company, an execution in its favor against J. P. Roosevelt was levied on twenty-one bales of cotton as his property.  A claim thereto was interposed by the Exchange Bank of Macon.  On a submission of the case to the presiding judge without the intervention of a jury, the cotton was found not subject.

1. It appears that Roosevelt was a cotton-buyer doing business in the city of Macon.  His dealings were with various parties living elsewhere, from whom he received, from time to time, special "orders" for cotton, which stated the price therefor the customer was willing to pay and the number of bales desired, and designated the point at which delivery should be made.  If he found he could buy cotton in the Macon market at a price which would admit of his making "a small commission" out of the transaction, Roosevelt would proceed to purchase, in his own name and on his own account, the cotton necessary to fill a customer's order, and would then ship the same as directed.  On receipt of the cotton, the latter would make payment therefor, at the price stipulated in his order, by honoring a draft drawn upon him by Roosevelt for the amount agreed on.  The "orders" so received were, properly speaking, mere offers or proposals on the part of his customers to buy, at a specified price, a limited number of bales for immediate delivery, and were subject to his acceptance or rejection.  He submitted to them no offers to sell; nor was he authorized to purchase on their account cotton in any quantity or at any price, but simply undertook to fill such special orders as they might from time to time send him.  For remuneration he depended solely upon his ability to purchase cotton in Macon at a price lower than that offered by his correspondents, this dif-

ference in price constituting the profit realized by him in any given instance. One of his customers was. the firm of W. W. Gordon & Co., of Savannah. The cotton levied on was purchased by him, in the usual course of business, on the faith of an order received from that firm.

In view of the facts above recited, it is obvious that the relation of principal and agent did not exist between Roosevelt and any one of his customers, and that he was an independent dealer, engaged in the business of buying and selling cotton in his own name and on his own behalf. Thus far, the case is free from difficulty.

2. As is stated above, the understanding between Roosevelt and his various customers was, that the latter were to pay for cotton only upon actual delivery to them at the point to which shipment was directed. This necessitated his first purchasing on his own account and paying for the cotton required to fill orders from them. Not having the means with which to conduct his business upon this basis, Roosevelt, at the beginning of the cotton season of 1895–6, applied to the Exchange Bank for assistance. Through its cashier, the bank entered into an arrangement with him whereby he was enabled to purchase cotton with which to fill his orders, the bank advancing the money necessary to pay for the same upon the express understanding that, upon payment by it of the purchase-money, all. cotton bought by him should immediately become the property of the bank. The particulars of this arrangement will be readily gathered from the following statement of the facts as disclosed by the record, which shows how both parties understood and acted upon the verbal agreement between them, upon which all their subsequent dealings were based.

On receiving an order from one of his customers which he thought could be filled at a profit, Roosevelt would proceed to purchase cotton in the local market, paying for the same by drawing a check on the bank in favor of the party from whom he bought, indicating in his check the number of bales embraced in that particular transaction. Upon presentation by the payee, this check would be honored by the bank, the amount thereof being charged against Roosevelt's account by

an entry upon its books.   Though all of the cotton thus pur-
chased was eventually sent to the compress, some of it was al-
lowed temporarily to remain in the different warehouses in
which it was stored.   At the close of each day, Roosevelt would
turn over to the bank either warehouse or compress receipts for
all cotton covered by his checks upon it of that date.   These
receipts were made out to him as owner of the cotton they
represented.   When desiring to make a shipment, Roosevelt
would call on the bank for his compress receipts, which he would
then deliver to the carrier, taking a bill of lading in his own
name, though immediately surrendering possession thereof to
the bank.   Thereupon a draft in favor of its cashier would be
drawn by Roosevelt upon his consignee for an amount cover-
ing the price the latter had agreed to pay for the cotton shipped,
and this draft, with bill of lading attached, would then be
forwarded by the bank to one of its correspondents for collec-
tion.   Upon payment of the draft, the bank deducted the usual
rate of exchange, and credited Roosevelt's account with the
balance of the amount thus realized.   On some transactions he
made a considerable profit; on others he lost money.   Thus
his account with the bank, while constantly varying, preserved
a pretty even balance; though often the bank's books showed
him largely its debtor, because he was not credited with the
proceeds of cotton sold until the drafts drawn therefor were
actually paid, and necessarily money had to be constantly ad-
vanced to him in order to enable him to buy.

As to Roosevelt's relation to the bank, it unequivocally ap-
pears that neither of the parties ever · contemplated that in
buying cotton he should assume to act as its agent.   In this
connection, its cashier testified:  "He was not buying it on ac-
count of the Exchange Bank. . . I left the price Roosevelt was
to pay for the cotton entirely with him.   It would be left with
Roosevelt as to when he should buy, if he wanted to buy;
there was no contract between Roosevelt and myself, on be-
half of the bank, that the bank had any supervision as to
what price he should pay, or what orders he should accept or
reject.   We have to leave it to the buyer; we can not go into
details of their business."   Nor was it understood that the

bank was to have any interest in the business conducted by Roosevelt, or was to get any part of the commissions made by him, or was to share with him any losses he might sustain. On the contrary, this same witness testified: "If Roosevelt had bought cotton on an order, and the party who gave the order failed before the cotton got there, or if he had held it a week and cotton went down, the bank would lose it—the bank would have to lose it, *because Mr. Roosevelt did not have a surplus.* If Roosevelt had been solvent, and the cotton had gone down after he bought it and checked on us for it and gave us a draft against it, or if the party had countermanded the order and we would have to sell it to somebody else at a discount, that loss would fall on the buyer, Roosevelt. If it went up, I would not make it. I had nothing to do with his profits, and I had nothing to do with his losses—except to try to make an arrangement to save me harmless. In case of a loss on some of these transactions, Roosevelt would pay us back when he made it on some other transactions; I would have expected him to pay it; would have expected the cotton to pay it, if it afterwards made it. If he had bought a lot of cotton and checked on us for a thousand dollars to pay for it, and had sold it to the person he bought for for a thousand and fifty, the draft I would draw would be for a thousand and fifty, and that fifty dollars would go to his credit on our books, and he could have checked on it to pay for a grocery bill, or anything else." The whole scheme seems to have been simply this: Roosevelt, having no authority to bind the bank by any contract he might make in its behalf, bought cotton entirely on his own responsibility and on his own account, the bank merely advancing him the money required to pay for the same; in order to secure repayment of the money thus advanced, he turned over to the bank, as collateral security, his warehouse or compress receipts, and subsequently substituted therefor a bill of lading representing the cotton purchased; and when his draft upon his customer was paid, the bank got back the money advanced to him, deducted the exchange to which it was entitled, and credited him with the net proceeds of the transaction, or charged him with the loss sus-

tained, as the case might be. Such is practically the explanation of the matter, as will be clearly seen from the following statement made by the bank's representative, when considered in connection with the above extracts from other portions of his testimony: "The bill of lading was our protection and covered the draft. The business between the bank and the cotton-buyer is generally largely a matter of confidence. I paid him money on the faith of his promise that he would bring me the cotton receipts in the afternoon, or the bill of lading. If he did not bring in the receipts, I don't know whether that would be a plain debt against him or not; but I would consider it a breach of trust. I mean, after I pay for cotton, my understanding is that he is to handle those receipts as our property, and bring them to us as our property, until the amount we have paid for them is repaid." The foregoing synopsis of the terms of the agreement between the bank and Roosevelt is also in accord with his own testimony in regard thereto.

The particular twenty-one bales involved in the present litigation was cotton which had been stored by various planters in the warehouse of W. A. Davis & Co., with instructions to sell. On December 19th, one of the members of that firm "sold the cotton to Mr. Roosevelt's agent, Mr. Clark." Davis & Co. "did not know anybody else" in the transaction, nor had they any knowledge of the arrangement with the bank under which Roosevelt was buying cotton. The warehouse receipts issued originally to the planters for this cotton were sent to Roosevelt's office on the afternoon of that day. On the following morning, he returned these receipts in order that the cotton might be "turned out" of the warehouse and sent to the compress; and, in settlement therefor, delivered to Davis & Co. a check drawn in their favor upon the Exchange Bank. Later in the day, but before the check was presented for payment, the levying officer appeared on the scene and gave notice of his intention to levy on these twenty-one bales. Davis told him to "wait awhile"; immediately dispatched a messenger to the bank with instructions to cash the check; and, on the latter's return with the money, said, "All right, then, it is Mr.

Roosevelt's cotton." Thereupon the officer levied the execution in his hands, and took from Davis & Co. a receipt for the twenty-one bales. Not until the presentation of the check was the bank aware of the purchase made by Roosevelt, nor had he, prior to the levy, turned over to it any of the warehouse receipts representing this particular cotton. Upon learning of the levy, the cashier of the bank made a demand upon Davis for repayment of the amount of the check, and suggested that he file a claim to the cotton, stating that Roosevelt had no funds in the bank, and that if it had known the facts, it would not have paid his check. Davis had, on the day the cotton was sold, settled with the planters whom he represented; and, after consulting his lawyer, declined either to refund the money or file a claim.

It is apparent that the question upon which this case must inevitably turn is: In whom was the *legal* title to this cotton at the time of the levy? This was the sole issue upon which the claimant invoked a ruling. If Roosevelt was the agent of the bank, its claim was well founded; otherwise, not. We are not prepared to hold that the fiduciary relation of principal and agent can properly be said to exist between two persons neither of whom is clothed with any authority whatsoever to bind or in any manner represent the other with regard to any negotiation or transaction with third persons; whose entire business dealings with each other are confined to matters in which third persons have no immediate interest or concern; and who at all times deal at arm's length, each avowedly representing no one but himself and undertaking to look after his individual interests only. The record before us presents just such a picture. Roosevelt had no authority to buy for the bank a single bale of cotton at any price; the latter was not authorized to act as his agent in purchasing cotton for him; nor could either make any contract with a third person which would be binding on the other. The bank paid his checks; they were charged against his account, not against the parties in whose favor they were drawn; ergo credit was extended to him, not to third persons with whom he dealt. The bank demanded security for every dollar advanced to him; he surren-

dered to it, to be held as collateral security for the money loaned to him, papers representing cotton, made out in his own name, which he procured from third persons who were strangers to the bank. When his customers honored drafts drawn on them, they simply complied with his directions as to how payment should be made; in other words, they paid *him*, for they had no direct dealings with the bank itself, and owed it nothing. These drafts were not worth, in Macon, their face value, because of the necessary expense incident to collection; accordingly, the bank accepted them at their real value only, deducting the usual rate of exchange. Any surplus over and above the amount necessary to repay the bank the money it had advanced to Roosevelt belonged exclusively to him, and the bank accounted to him for the same; so its interest even in these drafts was merely a qualified ownership, limited to the right of collecting the same and applying to the payment of its demands against him so much only of their proceeds as was required to extinguish his indebtedness to it. In none of the cotton purchased by him did the bank have any interest whatever beyond the right to hold it as security and subject it to the payment of its claim against him for money advanced; when such claim was satisfied, the bank's interest in the cotton or its proceeds thenceforth ceased entirely to exist; he was entitled to all net profits realized from a resale of the cotton, and upon him alone fell any loss arising therefrom. The bank did not occupy the position even of a partner in his business; much less was it the exclusive owner of that business. Each conducted a separate and distinct business; he being a dealer in cotton, the bank a dealer in money. He borrowed some of its goods; it held his cotton as collateral security for the return thereof in kind. In all their negotiations, though from the very nature of their dealings each necessarily had to repose more or less confidence in the good faith and integrity of the other, they dealt at arm's length and as strangers, bound together by no fiduciary relation.

Eliminating, therefore, all question of agency, and treating them as "independent contractors," for as such each undoubtedly dealt with the other, the legal effect of the verbal agree-

ment into which they entered will now be briefly discussed. We have not overlooked the fact that it was expressly understood and agreed between them that, immediately upon payment of Roosevelt's checks, the legal title to all cotton purchased by him was to vest in the bank, and that every bale thus bought and paid for should thenceforth belong absolutely to the latter until resold by its permission. As between themselves, this was doubtless an eminently proper and equitable arrangement. But the obvious infirmity of such an agreement is, that it has no binding force or effect upon any one not a party thereto. While the power to contract is certainly very broad, it is not altogether without restriction. The immediate parties to a contract may make "a law unto themselves," but it must necessarily prove impotent when its operation is sought to be extended so as to interfere with the rights of third persons. Wisely enough, in this State, the power to frame laws binding upon persons independently of their will has been vested exclusively in a General Assembly exercising legislative functions. Civil Code, § 5744. It follows that the rights of the Central Georgia Land & Lumber Company in the premises are to be tested, not by the terms of a contract between Roosevelt and another by which it was in no sense bound, but solely with reference to the general law of the land for such cases made and provided. A fundamental rule of law which we have never known to be seriously questioned is, that in order to pass the *legal* title to personalty, it is essential that there be either an actual or a constructive delivery of the property. Cotton packed into bales is certainly personalty. The transfer or surrender of warehouse receipts, or other symbols representing cotton, may very properly be regarded as equivalent to an actual physical delivery of the cotton itself, and therefore will operate as a constructive delivery passing title. So far as the twenty-one bales involved in this litigation are concerned, however, not one of them was actually delivered to the bank prior to the levy, nor did Roosevelt turn over to the bank a single receipt or other paper standing in place of the same. He was under a solemn promise and obligation so to do, and doubtless would have done so had it

been within his power; but the fact remains that he did not. At the time the levy was made, the bank held his promise to deliver, nothing more; and therefore it was practically empty-handed.

Furthermore, in the view we take of the case, the bank would occupy no better position even had Roosevelt made actual delivery of the cotton itself, and the same had been levied on while in its immediate, physical possession. It appears that the judgment against him had been duly entered on the general execution-docket of Bibb superior court nearly a year before this transaction took place. Necessarily, therefore, the bank had at least constructive notice thereof, and would take subject thereto any property belonging to Roosevelt which he might turn over to it as collateral security. As soon as Davis & Co. were paid for this particular lot of cotton, the legal title thereto passed into Roosevelt; for, as has been seen, he was buying it on his own account and at his own risk, and not as the agent of any undisclosed principal. However promptly he might thereafter have surrendered possession thereof to the bank, there must of necessity have elapsed an appreciable, even though it may have been an infinitesimal, interval of time, sufficient for the lien of the judgment to attach. Such a lien is notably expeditious. Indeed, the surprising facility with which it can attach to a debtor's property has frequently been the subject-matter of comment.

3. The case at bar is clearly distinguishable from that of *Tuttle & Wakefield* v. *Exchange Bank of Fort Valley*, 90 *Ga.* 653, relied on by the defendant in error. It did appear in that case that Cheeves, a cotton-buyer doing business at Fort Valley and having various customers located elsewhere, had an arrangement with a bank of that city, in some respects similar to that which Roosevelt made with the claimant in the present case, but in other respects entirely different. In the particular transaction then under investigation, Cheeves was not buying cotton on his own account, but as the agent of Strauss & Co., of Savannah. The latter sent their orders direct to their local representatives at Fort Valley, Gray Bros., who, in behalf of their principal, employed Cheeves to do the

actual buying.  Its president was member of the firm of Gray Bros., and it knew that both they and Cheeves were representing Strauss & Co. in the particular instance in question.  Accordingly, it was agreed between the bank, Gray Bros., and Cheeves, that the latter was to negotiate for the cotton and see that delivery was duly made to the bank, that it was to receive the cotton for and in behalf of his principal, honoring his checks on it for the purchase-price; and that Gray Bros. were thereupon to draw a draft upon Strauss & Co. in favor of the bank for an amount which would cover the money advanced by it on checks drawn by Cheeves.  Thus it will be seen that the bank did not advance its money on his credit, nor, indeed, upon the credit of Gray Bros., but really extended credit to their common principal, Strauss & Co.  The duty of Gray Bros. was simply to see that the orders sent to them were duly filled; Cheeves's duty was to actually purchase the necessary cotton and deliver it to the bank; and the bank, at the instance of Gray Bros., really undertook to act as the agent of their principal, Strauss & Co., in accepting delivery in behalf of and for the benefit of the latter and advancing funds with which to pay for the cotton, on condition that the same should be held by the bank as security until it was reimbursed by this common principal for the money so advanced.  After the cotton was shipped to Strauss & Co. and a draft upon them was drawn by Gray Bros. in favor of the bank, Cheeves had no further connection with the transaction.. He was in nowise interested in the proceeds of the draft, nor was he concerned as to any loss which might arise in the event Strauss & Co. declined to honor the draft and the bank had to dispose of the cotton to other parties for an amount less than it had advanced.  All the way through the transaction he acted simply as the accredited agent of Strauss & Co., buying the cotton in their behalf, and paying for the same by drawing upon a fund in bank which was really advanced to them solely on their credit, and which they were legally bound to repay,—provided, of course, as seems to have been true, their local agents were authorized to make with the bank, in their behalf, such an arrangement as was in fact agreed upon.

Had it appeared, in the case under discussion, that Gray Bros. were not really the authorized agents of Strauss & Co., but were merely independent cotton-dealers, and as such undertook to fill at a profit to themselves orders for cotton received from that firm, the facts presented would, in case of a levy upon the cotton as the property of Gray Bros., have been almost identical with those disclosed by the record now before us. In that event, Cheeves would have been the agent of Gray Bros., not the representative of Strauss & Co.; and the money paid out by the bank upon his checks would really have been advanced upon the credit of Gray Bros., who authorized him to draw, and the bank to pay, these checks, and then settled with the bank for the money checked out by Cheeves by drawing a draft therefor in its favor upon Strauss & Co. Accordingly, as compared with the various parties connected with the transaction now under investigation, Strauss & Co. would have occupied a position corresponding to that of Gordon & Co., a non-resident customer; Gray Bros. would have stood in the place of Roosevelt, an independent cotton-dealer; the Fort Valley bank would be found in the attitude of the Exchange Bank of Macon, a lender of money extending credit to a cotton-buyer by advancing him money with which to conduct his business; and Cheeves would have found his counterpart in "Mr. Roosevelt's agent, Mr. Clark," who performed precisely similar duties and was clothed with the same authority, save that he was not empowered to draw his individual checks upon the bank to pay for cotton purchased in behalf of his principal. Surely it could not be seriously contended in the present case that Mr. Clark had any interest in the cotton in controversy which could be reached by an execution against him.

The case relied on by the present claimant was decided in accordance with the well-known rule of law that an agent buying goods in behalf of his principal acquires, in his own right, no title thereto, legal or equitable. The decision therein announced can not, therefore, properly be considered as controlling, or as having any real bearing upon, the case at bar, in which, as has been seen, it unequivocally appears that the

plaintiff's debtor was buying the property levied on, not as the agent of another, but solely on his own account.

*Judgment reversed.　All the Justices concurring.*