Henry Hornblower et als. vs. Robert S. James }Eq. No. 9782.

October 17, 1930.

CAPOTOSTO, J. This is a bill in equity brought by Hornblower & Weeks against Robert S. James seeking affirmative relief from the consequences of an erroneous transfer of stock.

The material facts in brief follows:

Mr. James, a reasonably well informed investor and follower of the stock market, in January, 1929, decided to purchase 100 shares of J. C. Penney Company common "new" or "when issued (w. i.)" stock. At that time, although this contemplated issue of stock was being traded in "in contract" or "over the counter," no final action had been taken by the J. C. Penney Company as to the date of actual issue. The then existing common stock, referred to at the hearing as the "old" stock was then selling on the New York Stock Exchange at around $400 per share. The new stock deliverable when, as and if issued was being traded in by private sales between brokers at from $142 to $145 per share.

Mr. James, after making certain financial arrangements with the Rhode Island Hospital Trust Company, hereinafter referred to as the Trust Company, directed its investment department to purchase for him 100 shares J. C. Penney "new" or "when issued" stock at 144 per share. The order memorandum and the original order book of the Trust Company correctly describes the stock. The Trust Company thereupon, on January 21, 1929, placed an order for this particular stock with Hornblower & Weeks.

Hornblower & Weeks proceeded to fill this order. Through its New York office it contracted in its own name to buy from Shields & Company, another New York firm, the desired stock "when issued" at $143.50 per share.

On January 24, 1929, Hornblower & Weeks notified the Trust Company that it had succeeded in filling the order, properly describing the stock which it had contracted to buy from Shields & Company.

The following day the Trust Company advised Mr. James that it had purchased for him "100 shares J. C. Penney Company" stock. However, the mistake occurred, this is the first time that the stock is erroneously identified in the various communications between the parties in interest. Attention is called to the fact that the words "new" or "when issued" or the letters "w. i." are omitted.

Under the date of February 1, 1929. the Trust Company paid for the stock by crediting Hornblower and Weeks with the contract price. On the same day the Trust Company notified Mr. James that it had charged his account for the purchase of "100 shares J. C. Penney Company" stock. Again the stock is incorrectly described.

On February 2, 1929, the Trust Company in writing directed Hornblower & Weeks to "Register 100 shares J. C. Penney Company. In name of Mr. Robert S. James." This transfer order once more fails to correctly describe the stock for the reason already given.

Upon receipt of the erroneous transfer order from the Trust Company,

Hornblower & Weeks, by mistake, through its Boston office where all transactions are cleared, transferred 100 shares of J. C. Penney Company "old" stock in Mr. James' name and delivered it to the Trust Company. The Trust Company retained possession of this stock as collateral to Mr. James' loan. This stock was then selling at around $400 per share.

The stock so received was either not checked, or at all events not properly checked by the Trust Company with the original order memorandum or with its official order book, in both of which the stock which it was entitled to receive was ccorrectly described.

On March 13, 1929, Mr. James received a dividend of $7 a share, or $700, on the "old" stock which had been transferred to his name. He admits surprise at such good luck, for apparently he had been following the declining valuation of the "new" stock upon the market. Whether or not he took up the matter of his right to retain the dividend with the Trust Company is not quite clear. The fact is, however, that he did keep the money.

On May 10, 1929, the J. C. Penney Company authorized the issue of its new stock. It also gave their existing stockholders the right to subscribe to two shares of new stock at $7 a share for each share of old stock held by them. The new stock was then selling at $125 per share. The 200 rights appertaining to the 100 shares of old stock erroneously standing in Mr. James' name, therefore, had a market value of $25,000.

Upon receipt of the rights, Mr. James began to make inquiries from various people as to whether or not he was really entitled to them. He undoubtedly consulted the Trust Company in the matter. What facts he brought to its attention or what was the exact scope of the conversation between them is not clear. The fact remains. however, that the Trust Company made no investigation of the records

and stock in its own possession to determine the propriety of Mr. James retaining the rights. Mr. James and the Trust Company not only decided to keep the rights, but they went further and actually converted them into stock in accordance with the offer made by the J. C. Penney Company to its legitimate holders of then outstanding stock.

On May 17, 1929, Shields & Company of New York completed its contract of February 24, 1929, with Hornblower & Weeks by transferring to Hornblower & Weeks 100 shares of J. C. Penney "new" stock.

The error was discovered about July 25, 1929. Although a good deal of stress was laid as to who first brought it to light, it is immaterial in so far as the resulting legal situation is concerned.

The "new" stock was traded over the counter from January through May 10, 1929. The bid and asked quotations for this stock on certain dates, as far as can be ascertained, were as follows:

Jan. 25/29 (Date of original order). . . . . . . . . . . . . . . . .140—145

Mar. 13/29 (Date of cash dividend on "old" stock). . . . . . .130—135

May 10/29 Date of issuance of rights). . . . . . . . . . . . . . . . .125—128

As viewed by this Court, the legal problem presented rests upon the following fundamental facts, viz.: An agreement to deliver certain specified stock not in existence at the time of the making of the contract; delivery of different stock following an erroneous transfer order by the buyer; payment by the buyer at a time when such payment was not due for the stock purchased; and the retention by the buyer of the stock erroneously transferred for a considerable length of time without any real examination being made of the stock which had come into its possession for the purpose of determining whether or not the delivery as made was in accord-

ance with the terms of the contract between the parties.

Under this state of facts the complainants claim that they are entitled to a finding imposing a trust upon all the monies and stocks erroneously received by Mr. James. They in turn offer to deliver to him the stock which he really ordered; to repay to him the amount he expended for the exercise of the rights with interest thereon; and to allow him interest on the purchase price of the "new" stock from the time payment was made, that is, February 1, 1929, to May 17, 1929, when such stock was actually issued and the amount payable.

The respondent, on the other hand, takes the position that upon returning the stocks and monies which he now holds, he is entitled to rescind the entire transaction and be restored to his original status as if no contract had ever been made.

The legal situation presented is unusual. No controlling decisions have been offered by diligent counsel, nor has the Court itself been able to discover any ruling determinative of the points in issue.

The first proposition to decide is the relation of the parties on January 21, 1929, the date of the original order from the Trust Company to Hornblower & Weeks. There is no doubt but that the Trust Company was then acting as the agent of Mr. James. The complainants claim that the Trust Company and Hornblower & Weeks stand in the relation of buyer and seller. The respondent maintains that Hornblower & Weeks were nothing more than an agent of Mr. James.

The evidence establishes that as a result of the order from the Trust Company the firm of Hornblower & Weeks went out into the open market and contracted to buy in its own name and on its own account 100 shares J. C. Penney, when issued, stock at the lowest quotation. After careful consideration of all the facts, this Court is of the opinion that the real situation between the parties was one of sale and not of agency. Hornblower & Weeks were not the agent of the Trust Company or of Mr. James. In reality they were an independent dealer engaged in the business of buying and selling on its own behalf the particular stock requested. Of all the cases which have come to our attention the following two are nearest in point and strongly tend to support the Court's position.

*Yaeger* vs. *Mechanics Bank*, 204 N. Y. S. 38;

*Central Georgia Land Company* vs. *Exchange Bank*, 101 Ga. 345.

The second proposition is: Can the buyer rescind his contract under the peculiar facts in this case? We believe not. A buyer is under an obligation to inspect the delivery of commodities apparently made in compliance with his contract. He is expected to examine the property received within a reasonable time. What is a reasonable time naturally varies with the circumstances in each case, and depends to a great extent upon the nature and characteristicss of the commodity. A month or even more may be a reasonable time to decide if a complicated piece of machinery is what the buyer ordered and received. Stocks and other securities, which are subject to sudden and extensive fluctuations in value, fall in a different class. The infirmities to which they are subject demand an examination as soon as a delivery is made, or at least within a relatively short time thereafter.

Nor is any and every kind of an examination sufficient to relieve a buyer of responsibility. The examination to ascertain correctness of delivery must be reasonably accurate, having in mind the nature and characteristics of the commodity concerned. In some instances even a superficial examination may be sufficient; in others, an accurate scrutiny is demanded from the ordinary prudent buyer.

In this case it is fair to say that a careful check up of the stock when it was received might have prevented the consequences which followed. But honest mistakes have been made in the past and will continue to be made in the future. We are not unmindful of the fact that Hornblower & Weeks acted without investigating its own records when it received the erroneous transfer order from the Trust Company. This, however, did not absolve the Trust Company from the duty of inspecting the commodity which was actually delivered to it. If we give the facts a liberal interpretation and say that the Trust Company and Mr. James were to a certain extent misled unintentionally by the action of Hornblower & Weeks, the question arises as to when they, in the exercise of reasonable prudence, should have discovered the mistake. Unusual occurrences not only attract attention but often demand investigation. A person is put upon his notice when something outside the usual course of events comes to his attention in reference to a matter in which he is or should be interested.

In this case Mr. James was no novice in the investment field. While he does not fall within the class of the daily speculator, he, nevertheless, was conversant with the characteristics of stocks and kept himself reasonably informed through financial publications. He admitted being surprised when he received a dividend apparently applicable to stocks which at that time had not been issued. Hopeful expectation that his good luck was real seems to have been the extent of his investigation. It is difficult to say from the evidence whether or not he then consulted the Trust Company. On May 10, 1925, however, he was confronted with a situation which demanded positive action. At that time, even the uninitiated in stock transactions would have started a minute and serious inquiry.

The right to buy 200 shares of the the new stock, which was then selling on the market at 125 a share, for $7 a share was nothing to overlook. It was a beacon which signalled caution of the strictest kind. What did he do to ascertain the real situation? True, he went around inquiring from this and that friend as to his right to the rights, but this part of the investigation at least was superficial. Then Mr. James went to the Trust Company. What representations he made to it and what action he requested is shrouded in doubt. The fact is that the Trust Company made no check up of the transaction and not only told him to hold the rights but went further and advised him to purchase the stock.

We desire to give the respondent the utmost consideration possible. Yet we cannot permit him to cast an unjust burden upon Hornblower & Weeks even though we concede that its conduct may, to a certain extent, have influenced the Trust Company and Mr. James in their action. There was a duty upon them to inspect within a reasonable time the securities which were actually delivered. They failed to do so even after occurrences which would have caused the uninitiated to make a serious investigation.

This Court is of the opinion that the equities of the patries should be adjusted as of May 10, 1929. The respondent, therefore, shall return to the complainants all stocks and monies which he has erroneously received. The complainants, on the other hand, shall deliver to the respondent the "new" stock which really belongs to him; they shall allow the respondent interest on the purchase price of the "new" stock from the time payment was made, that is, February 1, 1929, to May 17, 1929, when such stock was actually issued and the purchase price payable; they shall pay to the respondent whatever sum he invested in converting the rights into actual shares of stock with

interest thereon from the date of investment. In compensation for any loss resulting from the mistaken delivery of stock, Hornblower & Weeks shall pay to the respondent the difference between $144 and $125 a share, that is, the difference between the contract price of the "new" stock and its market value on May 10, 1929, together with interest on such sum from said date.

For complainants: Hinckley, Allen, Tillinghast, Phillips & Wheeler.

For respondent: Emerson & Mason.