ANTONIA HOMERSKY

v.

THE WINKLE TERRA COTTA COMPANY et al.

*Opinion filed February 17, 1899—Rehearing denied April 7, 1899.*

1. APPEALS AND ERRORS—*Appellate Court's recital of facts is conclusive in Supreme Court.* The Appellate Court's recital of facts in its judgment upon reversing without remanding is conclusive of such facts, and the Supreme Court will not examine the record to determine whether such facts are correctly found.

2. SAME—*Supreme Court may inquire whether the Appellate Court correctly applied the law.* In determining whether the Appellate Court was right in reversing upon the facts without remanding, the Supreme Court may inquire whether the judgment is justified, in law, under the facts recited by the Appellate Court.

3. MASTER AND SERVANT—*master not liable if servant chooses to adopt hazardous methods.* A servant of a sub-contractor who voluntarily undertakes to perform work in a hazardous manner not contemplated by the contract, at the direction of a superintendent of the original contractor, who has no authority to control the servant or bind the sub-contractor, assumes the risk incident to such method, and neither the master nor the original contractor ·is liable for consequent injuries.

MAGRUDER, J., dissenting.

*Winkle Terra Cotta Co. v. Homersky,* 77 Ill. App. 42, affirmed.

WRIT OF ERROR to the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

The statement of facts and opinion by FREEMAN, J., of the Branch Appellate Court for the First District, on this record, are as follows:

"This is a suit brought by the appellee, as administratrix of her husband, August Homersky, who is alleged to have been killed while in the employ of the Winkle Terra Cotta Company through the negligence of the defendants. Appellants John and Paul McEwen were contractors engaged in the erection of a four-story building. They contracted in writing with the Winkle Terra Cotta

Company, as sub-contractor, to furnish and put in place
the terra cotta for the building, including a cornice. This
cornice extended along the top of the building and was
about sixty feet from the ground. The contract for set-
ting the cornice provided that the 'scaffolding, mortar,
iron anchors and hoisting of material' were to be fur-
nished by the McEwens. These anchors are said to have
been furnished, but, as the terra cotta was a little thicker
than the plans required, did not fit and were not used.
Upon the morning of the accident the four men employed
by the terra cotta company to set the cornice, including
the deceased, were at the building at eight o'clock ready
to work. As the anchors were not there, or, if there, were
not suitable for the use intended, for the reason stated,
the men waited and did not go on with the work. About
ten o'clock the general superintendent, Reed, employed
by the original contractors, came around and complained
vigorously because the work was not going on. The fore-
man of the terra cotta company explained that he was
waiting for the anchors and did not want to put up the
remainder of the cornice without them, but Reed, it is
claimed, insisted, and finally the men concluded to go on
without the anchors, and did so until about 3:30 P. M.,
when a heavy section of the cornice was pulled or fell
upon the scaffold, throwing the deceased to the ground,
causing his death. A verdict was obtained and judgment
rendered against the defendants, who prosecute separate
appeals, which, by stipulation, have been consolidated."

Mr. Justice FREEMAN, after making the foregoing
statement, delivered the opinion of the court:

"The negligence charged in the declaration, for which
it is sought to hold appellants responsible, consists in
the alleged failure of the McEwens to supply, and of the
terra cotta company to use, anchors which, it is claimed,
were intended to and would have held the cornice in place
and prevented the accident. In the view we are com-
pelled to take of the case it will not be necessary to

discuss at length the question whether the appellants, or either of them, were guilty of such negligence in these respects as would entitle the appellee to judgment in her favor.    It is, we think, sufficiently clear, and it seems to be conceded by appellants' counsel, that there was danger that the cornice would not remain in place when completed unless the anchors were put in as the contract. provided.    There was, therefore, great risk in proceeding with the work, adding piece after piece to the weight of the cornice and taking the chances of its fall.    It is said that only about twenty-five feet of it actually fell and more than seventy-five feet of it remained in place, notwithstanding all of it alike was destitute of anchors. Nevertheless the fact that any of it fell, as it evidently did, may be conceded to indicate the impropriety of proceeding with the work as was done, without the protection which the anchors were intended to afford.

"The testimony tends strongly to show that the immediate cause of the accident was that the deceased, perhaps in consequence of bending down after mortar, made a mis-step or slipped; that to save himself he caught at the cornice, which gave way under his hand and fell over upon him, knocking him from the scaffold and breaking the latter with its weight.    This is in accordance with the testimony of those whose position at the time enabled them to have the best opportunity of knowing the facts and who seem most worthy of credence as to that matter. There is also evidence given by the foreman, who was called as a witness by appellee, that deceased was told not to use his hammer so much on the cornice just before the accident, and replied, 'Oh, it can't be knocked down that way.'

"It is contended in behalf of appellants' counsel, that whatever negligence there was, if any, on the part of appellants, or either of them, in not furnishing or using the anchors, the actual and proximate cause of the accident was the use of his hammer by the deceased and the mis-

step which caused him to seize the cornice, thus pulling
it down upon him.   However that may be, the controll-
ing question here is whether the deceased voluntarily
assumed the danger and entered upon the work of his
own accord.

"There are certain facts which seem to be undisputed,
and are included in the statement made by the appellee's
counsel in their brief.   It is conceded that the Winkle
Terra Cotta Company was a sub-contractor engaged in
setting the cornice at the time of the accident, and that
deceased was in its employ.   He had been working for
said company, putting up the terra cotta work on this
building, for about two weeks.   The morning in question
the workmen employed by the terra cotta company were
on hand at eight o'clock, ready to put up the cornice.
They remained idle, waiting for the anchors, until about
ten o'clock.   At that time Reed, the general superintend-
ent of the building, representing, not the terra cotta
company, but the original contractors, John and Paul
McEwen, came around and found the men employed by
the terra cotta company doing nothing.   He was told by
the foreman of the latter, in the presence of the deceased
and his fellow-employees, that as he, the foreman, had
'no anchors up there' he would not 'start in.'   Reed in-
sisted that the terra cotta company's men should go to
work, and said that he was responsible for the job; that
if they did not go on he would get some one else.   Finally
the foreman said to his men, including the deceased, that
they had heard what Reed said, and if they wanted to go
to work they could do so.   The men were anxious to go
on, because, as the foreman testifies, 'the superintendent
was raising hell with them.'   At length the men concluded
among themselves that 'the cornices would stand without
anchors.'   One of them testifies that he said, 'on my part
I will go to work if Mr. Reed is responsible for the work.'
Accordingly they all went to work putting up the cornice
without the anchors, and continued at it from ten o'clock

in the forenoon until the accident, which occurred about 3:30 P. M.

"From this state of facts it is apparent that the men were doubtful of the propriety of going on without the anchors, but concluded that if Reed, representing the contractors for the building, was willing to take the responsibility of its falling and spoiling the job, they, as employees of the terra cotta company, would take the risk of putting up the cornice. They were not ordered by the foreman of the terra cotta company, to whom alone they were responsible, to go on with the work. They were given their free choice about the matter, and settled it among themselves. They took the responsibility of doing the work in a manner not contemplated by their employer and without said employer's knowledge or consent, for there is no evidence that the foreman, Freygang, had any authority except to do the work in accordance with the plans and specifications, which provided for the use of anchors. His refusal to do the work without anchors in the first place, and his leaving the matter to the men to determine, tend to show that he did not regard himself as having such authority. If their going on with the work without anchors under these circumstances was negligence, the negligence was clearly and wholly their own. It is not a question as to whether, by the contract of employment, they assumed any other risks and perils than those which are obvious to a person of ordinary understanding with opportunity for observation.

"It is not necessary to consider whether the deceased and his fellow-workmen assumed a risk not apparent to ordinary observation at the time. They knew they were doing the work in a way not contemplated by their employer and not embraced in their contract of employment. (See *Felch* v. *Allen*, 98 Mass. 572.) Whatever, therefore, the hazards may have been, they were assumed by the workmen of their own free will, and their employer cannot be held responsible to them for the consequences. See

*Camp Point Manf. Co.* v. *Ballou,* 71 Ill. 417; *Abend* v. *Terre Haute and Indianapolis Railroad Co.* 111 id. 209; *Pennsylvania Co.* v. *Lynch,* 90 id. 333.

"Doubtless, the conduct of Reed, the general superintendent for the McEwens, may have been reprehensible when he insisted that the work go on without waiting for the anchors. His conduct may have been inexcusably reckless, but he had no control over the men employed by the terra cotta company, and the relations of that company to his principals were regulated by an independent written contract. Probably he ought not to have urged that the work go on without anchors. He may, if he agreed to assume the responsibility in case the cornice should fall, have undertaken to make his principals liable to the terra cotta company for the damage it sustained, but his principals are not liable to the men for the consequences of the voluntary act of the latter, nor for the negligence, if any, of the independent contractor. *Jefferson* v. *Jameson & Morse Co.* 165 Ill. 138.

"There is no evidence here that the deceased and his fellow-employees were ignorant of the risk they assumed or that they were lacking in ordinary intelligence. The consequences of the accident are deplorable, especially to this appellee and her children, thus deprived of a husband and father; but unless the employer is to be held an insurer of his employees against their own acts no recovery can ever be had in this case. For this reason it is our duty to put an end to litigation which can never benefit the appellee. The judgment of the circuit court will therefore be reversed without remanding."

The Appellate Court, finding manifest error in the judgment of the circuit court of Cook county, reversed that judgment without remanding the cause and entered the following finding of facts as part of its judgment:

"That the Winkle Terra Cotta Company was a sub-contractor engaged in setting the cornice at the time of the accident, and that the deceased was in its employ,

and not in the employ of John McEwen, Jr., and Paul McEwen; that he had been working for the terra cotta company, putting up terra cotta work on the same building, about two weeks; that on the morning when the accident occurred the workmen employed by the terra cotta company were present at eight o'clock ready to go on with the work of putting up the cornice; that anchors proper to be used upon the cornice were not at hand; that the men remained idle, waiting for the anchors, until about ten o'clock in the forenoon; that at that time one Reed, the general superintendent of the building, who represented the original contractors, John and Paul McEwen, arrived and found the men employed by the terra cotta company, including the deceased, doing nothing and waiting for the anchors; that Reed was told by the foreman of the terra cotta company, in the presence of deceased and his fellow-employees, that as he, the foreman, had no anchors he would not start in to work; that Reed insisted that the terra cotta company's men should go to work, and that he said he would be responsible for the job, and if they did not go on he would get some one else; that finally the foreman said to his men, including the deceased, in substance, that they had heard what Reed said, and if they wanted to go to work they could do so; that the men were anxious to go to work because of the impatience of the superintendent, Reed, and that they finally concluded among themselves that the cornice would stand without anchors, and that if Reed was willing to take the responsibility for the work standing, they were willing to go on with it; that accordingly they all did go to work putting up the cornice without the anchors; that they continued so doing from ten o'clock in the forenoon until 3:30 o'clock in the afternoon, when the accident occurred; that they were not ordered by the foreman of the terra cotta company, to whom alone they were responsible, to go on with the work; that they were given their free choice in the matter and settled it among

themselves, and that they took the responsibility thus of doing the work in a manner not contemplated by their employer and without said employer's knowledge or consent; that the foreman, Freygang, had no authority except to do the work in accordance with the plans and specifications, which provided for the use of anchors, and that the negligence, if any, in going on with the work without anchors under these circumstances, was wholly their own."

S. P. DOUTHART, and J. J. KELLY, for plaintiff in error.

WILLIAM M. JOHNSON, for defendant in error the Winkle Terra Cotta Company.

D. J. & D. J. SCHUYLER, Jr., for defendants in error John McEwen, Jr., and Paul McEwen.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The plaintiff below prosecutes this writ of error and assigns numerous errors, which govern the judgment of the Appellate Court and its finding of facts.   The controlling facts found by the Appellate Court were, that the defendants in error the McEwens had a contract with the owner of the premises, who constructed the building on which the accident occurred; that the Winkle Terra Cotta Company was a sub-contractor of the McEwens, and an independent contractor for the purpose of furnishing material and setting the cornice upon the building; that the plaintiff's intestate, with others, at the time of the accident was employed by the Winkle Terra Cotta Company and under the charge of Charles Freygang, its foreman; that the latter had full control of the work of setting the cornice, and no right existed in the McEwens to interfere with its setting or dictate the manner in which the work was to be done; that the plaintiff's intestate was informed by Freygang that there were no

anchors for the purpose of supporting the cornice, and Freygang stated he would not go on with the work without anchors, when the men under his employ said they were ready to go on with the work without anchors if it was satisfactory to the foreman of the original contractors. They did go on with the work without investigation or inquiry, and took the responsibility with full knowledge of the danger and of the risk. Freygang had no authority to go on with the work except as contemplated by his contract. He did go on with the work without anchors and not in accordance with the plans and specifications, and the negligence which resulted in the death of the plaintiff's intestate was the negligence of Freygang and his employees.

Questions of fact are, under the law, to be determined by the Appellate Court, and its finding of facts cannot be questioned in this court, nor can we examine the record to determine whether the facts are found correctly by the Appellate Court. In *Jones* v. *Fortune*, 128 Ill. 518, we said: "If the Appellate Court shall refuse to remand the cause for the reason that the evidence does not tend to prove the cause of action alleged, it must, 'either wholly or in part, find the facts concerning the matter in controversy different from the finding of the trial court,' and in that event it is required to recite in its final order, judgment or decree the facts as found. The facts when thus recited are not the subject of controversy in this court, but we may inquire whether the law has been correctly applied to them, and therefore determine whether the refusal to remand was proper."

The ultimate facts were found by the Appellate Court and it reversed the judgment of the trial court without remanding the cause. Where the ultimate facts as found by the Appellate Court differ from the finding of the trial court, this court can do no more than determine whether the refusal to remand was proper, by inquiring whether the Appellate Court properly and correctly ap-

plied the law to the facts as found by that court. (*Hogan*
v. *City of Chicago*, 168 Ill. 551.)  The finding of facts by
the Appellate Court was clearly within its province.  The
facts were to be determined by it from the record.   The
finding of the ultimate facts by that court, and the court's
application of the principles of law thereto, must be held
to be correct.

We find no error in the record, and the judgment of the
Branch Appellate Court for the First District is affirmed.

*Judgment affirmed.*

Mr. JUSTICE MAGRUDER:  I dissent for reasons stated
in dissenting opinion appended to *Siddall* v. *Jansen*, 143
Ill. 543.