## SOUTHERN RAILWAY COMPANY *v.* MELTON.

1. Rule 9 of the railroad commission of Georgia, adopted under authority of the act of 1905 (Acts 1905, p. 120), is as follows: "Railroad companies are required to furnish cars promptly on request therefor. When a shipper files with a railroad company written application for a car or cars, stating therein the character of the freight to be shipped, and its destination, such railroad company shall furnish same within four days (Sundays and legal holidays excepted) from seven o'clock a. m. of the day following the receipt of such application. For a violation of this rule the railroad company at fault shall, within thirty days after demand in writing is made therefor, pay to the shipper so offended the sum of one dollar per car per day or fraction of a day, after the expiration of free time, during which such violation continues." *Held*, that such rule of the commission, made under authority of the act of 1905, is not unconstitutional and void on the ground that its adoption by the commission was an attempt on the part of that body to legislate, and was the exercise of a power which the legislature could not delegate to the commission, and the commission could not exercise, under the constitutional provision that "The legislative power of the State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives." FISH, C. J., dissenting.

2. The act of 1905 expressly conferred upon the railroad commission the power to adopt the rule above quoted, and such rule was not invalid on the ground that the commission had no authority to make it.

3. The act of 1905 was not unconstitutional and void on the ground that the title was not sufficient to include the conferring of power in the body of the act upon the railroad commission to impose "penalties," or on the ground that the title did not cover the provision in the body of the act making regulations as to the placing of cars.

4. The requirement of furnishing cars for intrastate shipment, made by the rule of the railroad commission quoted in the first headnote, is not void as imposing a burden upon interstate commerce.

5. The repeal of sections 3 and 4 of the act of 1905 by the act of 1907 (Acts 1907, p. 72) did not repeal the entire act of 1905 so as to render unenforceable amounts which had accrued, under it and the rule of the commission passed pursuant to it, in favor of a shipper prior to the approval of the act of 1907, but which had not been presented to the railroad commission in accordance with section 3 of the act of 1905.

Argued November 13, 1908.—Decided September 25, 1909.

Constitutional questions; from Court of Appeals.

The Court of Appeals certified to the Supreme Court the following questions:

"1. Is rule nine of the Railroad Commission of Georgia, as follows: 'Railroad companies are required to furnish cars promptly on request therefor. When a shipper files with a railroad company written application for a car or cars, stating therein the

character of the freight to be shipped, and its destination, such railroad company shall furnish same within four days (Sundays and legal holidays excepted) from seven o'clock a. m. of the day following the receipt of such application. For a violation of this rule the railroad company at fault shall, within thirty days after demand in writing is made therefor, pay to the shipper so offended the sum of one dollar per car per day, or fraction of a day, after the expiration of free time, during which such violation continues,' unconstitutional and void upon any of the following grounds, to wit: Because it is repugnant to article 3, sec. 1, par. 1 (Civil Code §5744), of the constitution of the State of Georgia, as follows: 'The legislative power of the State shall be vested in a General Assembly, which shall consist of a Senate and House of Representative,' because the prescribing of the penalties therein referred to by the Railroad Commission of Georgia was an attempt on the part of said body to legislate and was a power which the legislature of Georgia could not delegate to said commission and which said commission could not exercise; or because the enactment of penalties is a legislative function vested exclusively in the General Assembly?

"2. Is the rule of the Railroad Commission quoted in the foregoing question invalid on the ground that said Railroad Commission of Georgia had no power or authority to pass said rule; or that the same was passed by said commission without express power?

"3. Is the act of the General Assembly approved August 23, 1905 (Georgia Laws, 1905, p. 120), void and unconstitutional as being contrary to article 3, sec. 7, par. 8 (Civil Code, §5771), as follows: 'No law or ordinance shall pass which refers to more than one subject-matter, or contains matter different from what is expressed in the title thereof,' in that the body of the act purports to confer power upon the railroad commission to impose penalties and the title of said act makes no reference to that subject, or in that the body of the act makes regulations as to the placing of cars and no reference to that subject appears in the title of the act?

"4. Does the above-quoted rule of the railroad commission requiring the furnishing of cars for intrastate shipments impose a burden upon interstate commerce, for the reason that it has the

effect of withdrawing equipments necessary to take care of the company's interstate business, and is therefore void as being violative of article 1, sec. 8, par. 3, of the constitution of the United States, which confers upon Congress the power 'to regulate commerce with foreign nations and among the several States and with the Indian tribes.' ? Also, is it violative of the foregoing provision of the Federal constitution, because it embraces within its terms all cars, whether intended for interstate shipments or intrastate shipments, and thereby imposes a burden on interstate commerce; and is it therefore void as applied to a proposed shipment to be made wholly within this State?

"5. Was the act of the General Assembly approved August 23, 1905 (Georgia Laws, 1905, p. 120), and sections 3 and 4 of said act, which prescribe certain penalties, so far repealed by the act of the legislature of Georgia, approved August 23, 1907 (Georgia Laws, 1907, p. 72), as to render unenforceable penalties which accrued to a shipper under the above-quoted rule of the railroad commission prior to August 23, 1907, but which had not been presented to the railroad commission in accordance with section 3 of the act of August 23, 1905, until August 24, 1907?"

The act of 1905 (Acts 1905, p. 120), which it is claimed conferred the power upon the Railroad Commission to adopt the rule in question, has the following caption: "An act to further extend the powers of the Railroad Commission of this State, and to confer upon the commission the power to regulate the time and manner in which the several railroads in this State shall receive, receipt for, forward and deliver to its destination all freights of every character, which may be tendered or received by them for transportation; to provide a penalty for non-compliance with any and all reasonable rules, regulations, and orders prescribed by the said commission in the execution of these powers, and for other purposes." The first section of the act is as follows: "That from and after the passage of this act, the Railroad Commission of this State shall be, and is, hereby vested with full power and authority to make, prescribe, and enforce all such reasonable rules, regulations, and orders as may be necessary in order to compel and require the several railroad companies in this State to promptly receive, receipt for, forward and deliver to destination all freights of every character which may be tendered or re-

ceived by them for transportation; and as well such reasonable rules, regulations, and orders as may be necessary to compel and require prompt delivery of all freights, on arrival at destination, to the consignee." The second section provides: "That whenever a shipper or consignor shall require of a railroad company the placing of a car or cars to be used in car-load shipments, then, in order for the consignor or shipper to avail himself of the forfeitures or penalties prescribed by the rules and regulations of said Railroad Commission, it must first appear that such shipper or consignor made written application for said car or cars to said railroad; provided further, that such Railroad Commission shall, by reasonable rules and regulations, provide the time within which said car or cars shall be furnished after being ordered as aforesaid, and the penalty per day per car to be paid by said railroad company in the event such car or cars are not furnished as ordered; and provided further, that, in order for any shipper or consignor to avail himself of the penalties provided by the rules and regulations of said Railroad Commission, such shipper or consignor shall likewise be subject, under proper rules to be fixed by said commission, to the orders, rules, and regulations of said Railroad Commission." The third section is: "That before any railroad company is subjected to the penalties provided by this act, said Railroad Commission shall require said railroad company to show cause therefor; and if sufficient cause is shown, then said company shall be relieved from any further liability under this act." By the fourth section it is declared: "That for the violation of any such rules, orders, or regulations, so established by said commission, the railroad company so offending shall incur a penalty in a sum not exceeding two hundred and fifty dollars ($250), to be fixed by the jury after suit is brought therefor, under provisions of existing laws regulating the institution and prosecution of suits for penalties incurred by railroad companies in consequence of violations of the rules and regulations prescribed by said commission." The fifth section repeals conflicting laws.

*John F. DeLacy* and *McDaniel, Alston & Black,* for plaintiff in error. *V. E. Padgett,* contra.

LUMPKIN, J. Much litigation has arisen in regard to railroad commissions. At first railroad companies contested the constitutionality of acts creating these commissions and conferring upon

them the power to fix reasonable rates and to make reasonable rules and regulations.    The most common ground of attack was that this was a delegation of legislative power.    It is now firmly established by the decisions of the courts of this country, both State and Federal, that such powers can be conferred without constituting an unconstitutional delegation of legislative power.    See 8 Cyc. 834, and citations.    In this State the question was adjudicated as early as 1883, in the case of the *Georgia Railroad* v. *Smith,* 70 *Ga.* 694. Considering it, then, as settled that the legislature may establish such a commission and confer on it certain powers, the question is still raised as to the extent to which the legislature can go in that direction without violating the constitution.    In Georgia the constitution declares that "The legislative power of the State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives."    (Constitution, art. 3, sec. 1, Civil Code, §5744.)    The question which we have to deal with here is whether the act of 1905, and the rule of the railroad commission made in pursuance of it, are void as involving an unconstitutional delegation of legislative power to the commission.

It has been argued broadly that the legislature has power to delegate its legislative functions, and there are some expressions used in discussing cases, which might indicate that this could be done (*Franklin Bridge Co.* v. *Wood,* 14 *Ga.* 81; *Powers* v. *Inferior Court,* 23 *Ga.* 65, 80).  We think, however, that the sounder doctrine is that what is strictly and essentially a legislative duty must be performed by the legislature.    We may lay aside, therefore, the contention that the legislature has unlimited power to delegate its legislative authority, and confine ourselves to the question of whether they could confer the particular power here involved, without violating the general principle of the constitution above quoted.

The grounds on which the various decisions, upholding the creation of railroad commissions and the conferring of powers upon them, have rested, have not always been very clearly stated, or applied with literal accuracy to the facts of the case then under consideration.    Indeed it may be said that the application of the principles involved has rather been liberal for the effectuating of the constitutional and legislative purpose than narrow and strict.    The principal grounds which have been advanced in connection with

the question of delegation of legislative authority may be classified under a few heads:

(1)    The constitution having clothed the legislature with the State's power to legislate, that body may make any laws which it deems proper, unless in conflict with the constitution itself, or with the constitution of the United States, or laws enacted by Congress in pursuance thereof.

(2)    While the departments of government must be kept separate and distinct, it is impossible to draw a mathematical line by which every action can be exactly classified; and there are some matters which do not inherently and essentially appertain to one department of government rather than to another.    As a part of this ground has been considered the impossibility of conducting a government at all without permitting executive officers to exercise some discretion, or legislatures or courts to do some things incidental to their general purpose, but which in a literal sense are not strictly the enacting of laws or the rendering of judgments.    Illustrations of such matters may readily be drawn from the power conferred on executive agents to grant or refuse licenses, and to do many other acts essentially involving the exercise of discretion, the appointment of legislative committees of investigation, and the making of rules of practice and the appointment by the courts of certain officers.

(3)    Historical considerations as to powers which had been exercised by lawmaking bodies prior to the adoption of the constitutions of the United States and of the various States, and the actual status, practice, and accepted governmental theories in existence when such constitutions were made, and also contemporaneous construction or long-continued practice of departments of government, as throwing light on the constitutional intent, have been urged. Under this ground may be placed the legislative conferring upon or delegation of powers to municipal corporations as local governments.    Municipal corporations have sometimes been called exceptions to the general constitutional inhibition, express or implied, against the delegation of legislative authority.    It would probably be better to deal with their position as matter of constitutional construction, in the light of history, practice, and the existing status when the present constitution and those preceding it were adopted, in determining whether the statement that

legislative power was vested in the legislature was intended by implication to exclude the creation and conferring of municipal powers upon municipal corporations. This historical argument can not have the same force in reference to railroad commissions, which are of modern origin. It is, however, legitimate, as new problems arise, to draw light from contemporaneous construction, or long-continued practice of the departments of government, in reference to matters somewhat analogous to the creation of such commissions and the conferring of powers upon them.

(4) The power of making a law which shall become operative or effective upon a given contingency, sometimes illustrated by local option laws, where a law is passed, but is to take effect in a particular town or county upon the holding of· an election, or the recommendation of a grand jury; and other laws becoming effective upon the happening of some contingency.

(5) The power of the legislative body to make a law and to appoint administrative agents to ascertain and declare what particular instances fall within it, or what particular thing will satisfy and fulfil the general requirements outlined in the act, and so declare. The legislature having power to establish reasonable rates, rules and regulations, it would be impossible in an act to go into all the minutiæ connected with the fixing of each rate and regulation of different railroads, with the vast variety of different commodities and circumstances, perhaps changing from season to season and from year to year; and unless the legislature could pass an act outlining the governing principles in somewhat general terms, and leave the railroad commission to fill in the details, the power of the legislature on the subject would be practically useless and impossible of execution. In this connection it has been said that when the legislature has power, or is charged with the duty, of making laws to accomplish the reasonable regulation of railroads and the fixing of reasonable rates, they may provide the necessary means for effectuating that purpose, not distinctly violative of any constitutional provision.

In *Georgia Railroad* v. *Smith*, 70 *Ga.* 694, supra, the constitutionality of the act of 1879 (Laws 1878-79, p. 125, Civil Code of 1895, §2185 et seq.) was attacked as an attempt to delegate legislative power to the railroad commission. That act created the commission, prohibited railroads from charging more than a fair and

reasonable rate of toll or compensation for the transportation of passengers or freight, declared that the doing so should be extortion, required the commission to make reasonable and just rates of freight and passenger tariffs and reasonable and just rules and regulations, and contained other provisions not necessary to recite. Crawford, J., in delivering the opinion, said: "The act of October 14, 1879, provides that fair and reasonable rates only shall be charged by the railroads of the State. Did the constitutional convention, by paragraph 1, section 2, article 4, intend more than the passage of a general law, such as this, to carry into effect the clause here referred to? It certainly was not contemplated that the details of rates, to be fixed over the many miles of railway in the State, should be settled and determined by the legislature. The many influences that combine to cause changes in the ever-varying vicissitudes of trade and travel were neither overlooked nor forgotten by that body. The utter impossibility of preparing by the legislature just and proper schedules for the various railroads, with their differences of length, locality, and business, appears to us to be so clear and manifest as that to have entertained it would have been absolutely absurd. And especially so, when it is remembered that schedules just and right, where arranged for the months of winter, might be ruinously unjust and wrong for the months of summer; or that such as were proper for the year of the meeting of the General Assembly might the succeeding year well-nigh bankrupt every railroad corporation in the State. . . The difference between the power to pass a law and the power to adopt rules and regulations to carry into effect a law already passed is apparent and strikingly great, and this we understand to be the distinction recognized by all of the courts as the true rule in determining whether or not in such cases a legislative power is granted. The former would be unconstitutional, whilst the latter would not." Thus it is settled in this State that the legislature may generally outline the duty of fixing rates which shall be reasonable and just, and leave to the commission the duty of adopting rules and regulations to carry into effect the law already passed. In some States the creation of a railroad commission and the regulation of rates appear to have been under the general power of the legislature, without any express constitutional reference to the subject. In our constitution there is not only a declaration of the existence of power in the legis-

lature to regulate railroad freight and passenger tariffs, but it is affirmatively stated (referring to the legislature), "whose duty it shall be to pass laws" for that purpose and to prohibit such roads from charging other than just and reasonable rates, and enforce the same by adequate penalties. Constitution, art. 4, sec. 2, par. 1; Civil Code, § 5797. A reference to the stenographic report of the debates in the constitutional convention will show that this mandatory form of words was not accidental or inadvertent, but was deliberate and intentional. See Small's Rep. Const. Con. 1877, 392 et seq., 401.

If, then, the constitution not only permits but commands the making of such regulations and the enforcement thereof, and if the legislature may outline the duty of fixing reasonable rates and making reasonable regulation, leaving the work of detail to the commission, as held in the case above cited, it is not easy to draw an exact line at which this power of conferring authority on the commission as to details must stop; and unless the authority conferred in the present case is clearly in violation of the constitution, the act of the General Assembly, and the rule made in pursuance of it, should not be declared void. There is a point in the conferring of such power beyond which the legislature can not constitutionally go, as already indicated; but it is not practicable in advance to lay down an absolute general rule as to where the line of demarkation is. It can only be said that what is strictly and exclusively a legislative duty, such as the making of a law, can not be delegated, but some authority to adopt rules and regulations necessary for the carrying of the law into effect may be delegated. Within these general limitations each case must be determined as it arises.

It is a familiar rule that an act of the legislature will not be declared unconstitutional except where it is clearly and palpably so. This has been many times emphatically stated by this court. In *Boston & Gunby* v. *Cummins,* 16 *Ga.* 102, 105 (60 Am. D. 717), it was even said that where the power of the legislature was involved, in order to set aside an act as exceeding such power, the case must be "one which requires no nice critical acumen to decide on its character, but which is as obvious to the comprehension of any person as an axiomatic truth." *Wilder* v. *Lumpkin,* 4 *Ga.* 212; *Flint River Steamboat Co.* v. *Foster,* 5 *Ga.* 195, 209 (48 Am.

D. 248) ; *Cutts & Johnson* v. *Hardee,* 38 *Ga.* 350 ; *Welborn* v. *Akin,* 44 *Ga.* 420. In *Beall* v. *Beall,* 8 *Ga.* 210 (19), it was said : "'The constitution declares, that the three powers of the government— viz., the legislative, executive, and judiciary—shall be distinct; still the separation is not, and, from the nature of things, cannot be total." In Paddell *v.* City of New York, 211 U. S. 446 (29 Sup. Ct. 139, 53 L. ed.), it was said : "A constitution can not be carried out with mathematical nicety to logical extremes." In Wayman *v.* Southard, 10 Wheaton, 1-43 (6 L. ed. 253), Chief Justice Marshall said "It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which aie strictly and exclusively legislative. But Congress may certainly delegate to others powers which the legislature may rightfully exercise itself." The last sentence, as we understand it, is not to be construed as in conflict with the first, but as supplementing it, and referring to powers not strictly and exclusively legislative. Again he said : "The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions, to fill up the details." Some illustrations of powers which it has been held that Congress or a legislature can lawfully delegate will be given. The non-intercourse act of Congress of March 1, 1809 (Acts 1809, c. 24, 2 Stat. 528), forbidding the importation of goods, wares, or merchandise from any port or place in Great Britain or France, provided that "the President of the United States be, and he hereby is authorized, in case either France or Great Britain shall so revoke or modify her edicts as that they shall cease to violate the neutral commerce of the United States, to declare the same by proclamation;" and thereafter the trade suspended by the act mentioned could "be renewed with the nation so doing" (2 Stat. 530, §11). On the expiration of that act by its terms, another was enacted providing that if either Great Britain or France *so* revoked or modified her edicts "as that they shall cease to violate the neutral commerce of the United States, which fact the President of the United States shall declare by proclamation, and if the other nation shall not" within a given time revoke or modify her edicts in like manner, then certain sections of the act of 1809 "shall from and after

the expiration of three months from the date of the proclamation aforesaid be revived," etc. In the case of the Brig Aurora, 7 Cranch, 382, 388 (3 L. ed. 378), this was held to be constitutional, and not to be void as a delegation of legislative power. It was said that Congress could exercise its discretion in reviving the act of March 1, 1809, either expressly or conditionally. In Field v. Clark, 143 U. S. 649 (12 Sup. Ct. 495, 36 L. ed. 294), where the third section of the tariff act of October 1, 1890 (c. 1244, 26 Stat. 612), authorized the President to suspend the provisions relating to the free introduction of specified articles whenever and as often as he should be satisfied that the government of any country producing and exporting such articles imposed a duty or other exaction upon agricultural or other products of the United States, which he should "deem to be reciprocally unequal and unreasonable," the majority of the court (two Justices dissenting) held that this broad discretionary power conferred on the President did not invest him with the power of legislation. In Buttfield v. Stranahan, 192 U. S. 470 (24 Sup. Ct. 349, 48 L. ed. 525), the Secretary of the Treasury was authorized, upon recommendation of a board of experts, to establish standards of teas which might be imported into the United States, and others not coming up to such standards were to be excluded. It was said (p. 496): "We may say of the legislation in this case, as was said of the legislation considered in Field v. Clark, that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted." In Union Bridge Co. v. United States, 204 U. S. 364 (27 Sup. Ct. 367, 51 L. ed. 523), the river and harbor act of March 3, 1899 (c. 425, 30 Stat. 1121), was involved. By the 18th section of that act (30 Stat. 1157, U. S. Com. St. 1901, p. 3545) it was provided that, "Whenever the Secretary of War shall have a reason to believe that any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable waterways of the United States is an unreasonable ob-

struction to the free navigation of such waters, on account of insufficient height, width of span, or otherwise, or where there is difficulty in passing the draw opening or the draw span of such bridge by rafts, steamboats, or other water craft," it should be his duty, after giving the parties reasonable opportunity to be heard, to give notice to the persons owning or controlling the bridge to so alter it as to render navigation reasonably free, easy, and unobstructed; that he should specify the changes recommended by the chief of engineers, as required to be made, and should prescribe a reasonable time for making them; that if at the end of the time the alterations had not been made, the Secretary of War should notify the United States district attorney, and if after receiving the notice prescribed by the act the person owning or controlling the bridge should wilfully fail or refuse to remove it, or to comply with the lawful order of the Secretary of War, such person should be deemed guilty of a misdemeanor, and prosecution should be instituted accordingly.    It was held that this was not an unconstitutional delegation of legislative or judicial power.    See also Railroad Commission Cases, 116 U. S. 307 (6 Sup. Ct. 334, 388, 1191, 29 L. ed. 636) ; Kansas *v.* Missouri Pacific Ry. Co., 76 Kans. 467 (92 Pac. 606), and authorities there cited; *Phinizy* v. *Eve,* 108 *Ga.* 360, 362 (33 S. E. 1007; *Mayor etc. of Brunswick* v. *Finney,* 54 *Ga.* 856 (municipal charter to take effect upon vote of people of the city) ; *Murphy* v. *Educational Board of Burke County,* 71 *Ga.* 856 (provision of law for payment of school officers not to operate in a county after grand jury shall otherwise recommend) ; *Caldwell* v. *Barrett,* 73 *Ga.* 604 (local law prohibiting sale of liquor, submitted to vote) ; *Haney* v. *Commissioners,* 91 *Ga.* 770, 18 S. E. 28 (road law to go into effect in county on recommendation of grand jury) ; *Coleman* v. *Board of Education,* 131 *Ga.* 644, 63 S. E. 44 (school tax, put into effect in counties or districts by vote).

In 6 Am. & Eng. Enc. Law (2d ed.), 1022, it is said: "A marked tendency appears in the direction of assigning duties heretofore deemed legislative to other bodies: to boards and commissions, to local authorities, and especially to the voters." In Blue *v.* Beach, 155 Ind. 121 (80 Am. St. R. 195, 50 L. R. A. 64, 56 N. E. 89), it was held, that a statute which established a State board of health, in order to secure and promote the public health, and

which invested such board with power to adopt ordinances, rules, and regulations necessary to secure such objects, was not unconstitutional as being a delegation of legislative power, as the inhibition against so doing did not extend to prevent the granting to an administrative board of power to adopt rules and regulations to carry out a particular purpose; that rules and by-laws adopted by such board of health had the force and effect of laws, but must be reasonable, and not in conflict with the constitution, or opposed to the fundamental principles of justice, or inconsistent with the powers conferred upon the board. It was also held, that, under a statute conferring power on a local board of health to protect the public health and to prevent the spread of contagious and infectious diseases, such board might, in time of danger of a smallpox epidemic, require that no unvaccinated child be allowed to attend the public schools during the continuance of such danger; or that the board might, in its discretion, direct that the schools be temporarily closed during the emergency. In Isenhour v. State, 157 Ind. 517 (87 Am. St. 228, 62 N. E. 40), it was held that the provision of a pure-food law that within ninety days after its passage the State board of health should adopt measures to facilitate its enforcement, and prepare rules regulating standards, defining adulterations, and declaring methods of collecting and examining foods and drugs, was not an unconstitutional delegation of legislative power. So violations of rules of park commissions have been held punishable as offenses against the State. Brodbine v. Inhabitants of Revere, 182 Mass. 598 (66 N. E. 607). In United States v. Ormsbee, 74 Fed. 207, it was held that the provision of an act of Congress which granted to the Secretary of War authority to prescribe such rules and regulations for the use, administration, and navigation of canals, etc., owned or operated by the United States, as in his judgment public necessity might require, was not invalid as a delegation of legislative power; and that the rules made pursuant thereto had the force of law, so that persons violating them by drawing off water from a canal were subject to criminal punishment under the provisions of the same act. The powers of the Secretary of War and the Secretary of the Navy to prescribe rules and regulations for the government of the army and navy respectively have been recognized and, within their spheres of authority, the regulations so

made have been declared to have the force of law. United States v. Eliason, 16 Pet. 291 (10 L. ed. 968); Gratiot v. United States, 4 How. 80 (11 L. ed. 884); Smith v. Whitney, 116 U. S. 167, 180, 181 (6 Sup. Ct. 570, 29 L. ed. 601); United States v. Maurice, 2 Brock. 96, 105 (Fed. Cas. No. 15747); Ex parte Reed, 100 U. S. 13 (25 L. ed. 538). In discussing the question of delegation of power to railroad commissions, in the case of Chicago & N. W. Ry. Co. v. Dey, 35 Fed. 866, 874 (1 L. R. A. 744), Brewer, J., said: "While, in a general sense, following the language of the Supreme Court, it must be conceded that the power to fix rates is legislative, yet the line of demarcation between legislative and administrative functions is not always easily discerned. The one runs into the other. The law books are full of statutes unquestionably valid, in which the legislature has been content to simply establish rules and principles, leaving execution and details to other officers. Here it has declared that rates shall be reasonable and just, and committed what is, partially at least, the mere administration of that law to the railroad commissioners."

Keeping in view, then, the limitation that powers which are strictly and exclusively legislative can not be delegated, but recognizing the rule that there are subjects which may be regulated by direct legislation, if practicable, but for which general provisions may be made, and the power given to a commission, which is to act under such provisions, to fill up the details; also bearing in mind the cardinal rule that acts of the legislature will not be held unconstitutional unless they are plainly and clearly so; and that, under the mandate contained in the constitution of this State, the legislature has undertaken to carry out the public purpose therein indicated, but that (as held in the case of the *Georgia Railroad* v. *Smith,* supra) it is practically impossible for them to provide for all of the details necessary, and that power to make rules and regulations in pursuance of the general purpose and direction outlined in the statute has been conferred upon the railroad commission; and bearing in mind further that such a statute should not be given a strict and narrow construction so as to defeat the purpose of the legislature and that of the constitution, but should rather be liberally construed so as to effectuate the objects for which it was passed,—let us now more specifically consider the act of 1905 (Acts 1905, p. 120), and the rule of the railroad commis-

sion known as No. 9, adopted in pursuance thereof, and determine whether it can be said that they are plainly and palpably violative of the fundamental law.

The act of 1905 expressly conferred upon the railroad ·commission "full power and authority to make, prescribe, and enforce all such reasonable rules, regulations, and orders as may be necessary in order to compel and require the several railroad companies in this State to promptly receive, receipt for, forward and deliver to destination all freights of every character which may be tendered or received by them for transportation." It declared that the railroad commission should, "by reasonable rules and regulations, provide the time within which" such car or cars should be furnished after being ordered, "and the penalty per day per car to be paid by said railroad company in the event such car or cars are not furnished as ordered." The act also made provision for a hearing and relief of the carrier, upon proper cause shown, "from any further liability under this act." A penalty not exceeding $250 was provided to be recovered by the State for any violation of the rules of the commission.

It was contended, that the provision in regard to fixing a reasonable charge for delay in furnishing cars conferred on the railroad commission a power to fix a penalty; that penal laws are peculiarly matters within the power of the legislature to enact; and that such power could not be conferred on the commission. If it be conceded for the present purpose that the legislature alone can enact penal or criminal laws proper, and that they can not constitutionally transfer or delegate that power to any other persons, was the act of 1905 in violation of that constitutional restriction? In Huntington v. Attrill, 146 U. S. 657, 667 (13 Sup. Ct. 224, 36 L. ed. 1123), it was said: "In the municipal law of England and America, the words 'penal' and 'penalty' have been used in various senses. Strictly and primarily, they denote punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offence against its laws. United States v. Reisinger, 128 U. S. 398, 402 (9 Sup. Ct. 99, 32 L. ed. 480) ; United States v. Chouteau, 102 U. S. 603, 611 (26 L. ed. 246). But they are also commonly used as including any extraordinary liability to which the law subjects a wrong-doer in favor of the person wronged, not limited to the damages suffered. They are so elastic in meaning as even to

be familiarly applied to cases of private contracts, wholly independent of statutes, as when we speak of the 'penal sum' or 'penalty' of a bond. . . Penal laws, strictly and properly, are those imposing punishment for an offence committed against the State, and which, by the English and American constitutions, the executive of the State has the power to pardon. Statutes giving a private action against the wrong-doer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal." In *Neal* v. *Moultrie*, 12 *Ga.* 104, it was held, that, "In all cases where a statute creates a right of action and recovery in individuals, or a particular class of individuals, such statute is not penal, but remedial." This was said in discussing a statute which rendered directors of a bank liable as individuals under certain circumstances, and authorized an action to be brought against them by any creditor or creditors of the corporation. Se also *Banks* v. *Darden*, 18 *Ga.* 318; *Wheatley* v. *Glover*, 125 *Ga.* 729 (54 S. E. 626) ; *Pennington & Evans* v. *Douglas, Augusta & Gulf Ry. Co.*, 3 *Ga. App.* 665 (60 S. E. 485) ; Bell *v.* Farwell, 176 Ill. 489 (68 Am. St. R. 194, 42 L. R. A. 804, 52 N. E. 346). In the case of Board of Harbor Commissioners *v.* Excelsior Redwood Co., 88 Cal. 491 (26 Pac. 375, 22 Am. St. R. 321), the act under consideration authorized a board of harbor commissioners to impose a penalty not exceeding $500 for a violation of its rules. The action was by the board to recover such penalty, and was thus a proceeding by the public officials to recover an amount of money for punitive purposes on account of a disobedience of rules, and not a remedial action by a private person. The Supreme Court of California has also taken a different view from this court in regard to the power to enact laws to take effect upon a contingency. Compare Ex parte Wall, 48 Cal. 279, 313 (17 Am. R. 425), with decisions of this State already cited, such as *Coleman* v. *Board of Education,* supra. This is also true of some other States. We have had in this State, long in force and never questioned, laws authorizing commissioners of pilotage to be appointed by the corporate authorities of certain cities, with quite extensive powers. Pol. Code, §§ 1651, 1671, et seq.

A consideration of the terms of the act of 1905 will show that the word "penalty," in the second section, was not employed in its strict sense, but as meaning a reasonable amount to be fixed by the

rule of the commission, recoverable by the shipper on account of a failure to furnish cars to carry his freight within a reasonable time named in the rule.    By the fourth section of the act of 1905 the legislature provided for a penalty in the punitive sense.    And although the word "penalty," along with others, is used in the second section, in dealing with the question of recovery by a shipper for delay in furnishing cars, we can not presume that the legislature intended merely a duplication of punishment in the same act.    This act does not leave to the railroad commission the power of enacting a penal law.    It does not even leave to the commission the power broadly to impose forfeitures or to provide for pecuniary recoveries at their will.    The legislature itself enacted the law and outlined the duty and power of the commission on this subject, and indicated the matter to be dealt with by the commission, the purpose of dealing with it, and the authority of the commission in reference to carrying into effect that purpose.    It not only authorized but required the fixing, by "reasonable rules," of an amount to be paid per day for failure to furnish cars.    It is difficult to see why the reasoning on which the authority of the legislature has been upheld to establish the commission and authorize it to carry into effect the legislative purpose, and, to that end, to make rules and regulations and fix rates which should be "reasonable," is not applicable to this act. If the legislature itself could provide in general terms for the making of reasonable rates, charges, and regulations, but leave the details to be carried into effect by the commission, for the reasons stated in the case of the *Georgia Railroad* v. *Smith,* supra; and if the legislature also had authority to require the prompt furnishing of cars by a railroad company, and to name a reasonable amount recoverable by the shipper for a default on the part of the carrier in that respect, why could they not provide for this in general terms, as in the other case, and leave it to the commission to investigate and declare by rule what would be a reasonable time and amount?

It may be said that the legislature may constitutionally confer upon the railroad commission the power to regulate demurrage charges; but that demurrage is a charge for the use of the car of the company, or its detention, and is therefore a proper subject of regulation by the commission, while the charge now involved is for a failure to furnish cars, and not the subject of regulation by that body.    Demurrage was originally a maritime term, and signified

the amount to be paid by the charterer to the owner of a ship for detaining her in port longer than the time specified. Usually this was fixed in the charter-party. If not, it was subject to be determined by the court, and it was said that damages in the nature of demurrage could be recovered. Demurrage was thus not strictly a charge for carriage, but for causing delay in the voyage. The Apollon, 22 U. S. 362, 378 (6 L. ed. 111); Wordin *v.* Bemis, 32 Conn. 268, 273 (85 Am. Dec. 255). The word has also been used as including loss of the use of a vessel on account of an unlawful detention. The Conqueror, 166 U. S. 110 (17 Sup. Ct. 510, 41 L. ed. 937). It has been said that every improper detention of a vessel may be considered a demurrage, and compensation in that name may be obtained for it. 2 Words and Phrases, 1981, and citations. By analogy the word has been applied in railroad transportation to signify a somewhat similar delay of cars by a shipper and an allowance therefor. It was early claimed that demurrage charges should stand on the same footing as charges for transportation proper; and the term "extended freight" was coined, and has been frequently employed, it being said that demurrage might be treated as a species of "extended freight." It was not denied that the legislature could authorize the railroad commission to fix reasonable demurrage charges. It was also not denied that the legislature could fix a reasonable reverse charge in favor of the shipper against the carrier for failure on the part of the latter to furnish cars within a reasonable time, unless relieved from so doing by some proper defense. A name for this counter-charge has also been coined,— "reciprocal demurrage." In regulating the duty of a carrier to furnish cars promptly and fixing the amount of the charge which may be made against the shipper for delay in connection therewith, the legislature has conferred upon the railroad commission the power to fix by rule the amount of the reasonable charge so to be made, called demurrage. It has also provided for a reasonable counter-charge against the carrier for failure to promptly furnish the cars, and required the shipper in order to make claim therefor to submit himself to proper rules and regulations. Why can not the General Assembly leave to the commission the fixing by rule of a reasonable amount for such counter-charge or "reciprocal demurrage" growing out of delay in furnishing cars, as well as the fixing of the demurrage charge for delay on the part of the shipper? Are

not the two things—delay of the shipper in dealing with a car and delay of the carrier in furnishing it—so closely related as to authorize the legislature, instead of dealing with them separately, to outline the duty and liability and leave the commission to fix the amount of each charge? Counsel who filed a brief on behalf of the railroad commission aptly stated that "A failure to furnish cars to be loaded or to transport cars loaded for shipment may be an abuse or an unjust discrimination in rendering the public service." See, on this subject, Yazoo R. Co. v. Keystone Co., 90 Miss. 391 (43 So. 605, 13 Am. & Eng. An. Cas. 960, and note on p. 964).

We have found no decision directly dealing with a rule of a railroad commission similar to the one now under consideration on the point being discussed, except that in State v. Atlantic Coast Line Railroad Co. (Fla. 1908), 47 So. 969, where such a rule and the law authorizing it were held not to be invalid on the ground that they constituted a delegation of legislative authority to the railroad commission. The decision was concurred in by five Justices. The sixth concurred specially, because the judgment of the trial court sustaining a demurrer should have been affirmed on another ground than that on which he based it, but said that the discussion of the validity of the rule of the commission was obiter dictum. If, however, a judge sustained a demurrer on one ground, it would not seem to be pure obiter dictum to discuss all the questions involved—whether the ruling was right or wrong on the ground of demurrer on which it was based, and, if wrong on that ground, whether the judgment should be affirmed for some other reason. Whitfield, J., delivering the opinion, in which the majority of the court concurred, declared that the constitutionality of the statute and of the rule of the railroad commission was involved. The discussion there was in consonance with what has been said above. See also State v. Seaboard Air-Line Ry. (Fla. 1908), 47 So. 986, 991. In Virginia a somewhat similar rule has been held reasonable in regard to intrastate commerce; but the rulings in that State on the subject now being discussed furnish little aid in the present consideration, because of the extensive provisions in the Virginia constitution in regard to the railroad commission.

In some States, where rulings have been made not according with that here announced, it will be found that the construction of the power of the legislature to pass an act which shall take effect in a

given locality after the holding of an election, or upon recommendation of the grand jury, or in similar cases, is different from the rulings on those subjects made in this State; and decisions in those States ought not to override the general tenor of our decisions, and produce a result out of harmony with their spirit.

The act under consideration in *Western Union Telegraph Co.* v. *Taylor,* 84 *Ga.* 408 (11 S. E. 396, 8 L. R. A. 189), was different in its character from that now being discussed. In the telegraph act, telegraph companies were required to receive, transmit, and deliver messages in good faith and with due diligence, "under penalty of one hundred dollars, which penalty may be recovered by a suit in a justice or other court having jurisdiction thereof, by either the sender of the dispatch, or the person to whom sent or directed, whichever may first sue," and it was provided that nothing in the act should be construed as impairing or in any way modifying the right of any person to recover damages for a breach of a contract or duty of the company. Nor are the decisions applicable in which it has been held by several courts that an act authorizing an insurance commissioner to prepare a form of policy which shall be adopted by insurance companies was unconstitutional. Without discussing the merits of those rulings, the point involved in the present case is different. The bald power, standing alone, conferred on a person to prepare a form of policy is quite different from the conferring of power on a railroad commission to regulate freight and passenger tariffs, enforce prompt furnishing of cars and transportation of them, and fix reasonable amounts as recoverable by the railroad for demurrage for delay of the shipper, or reasonable amounts recoverable by a shipper for the delay of the company in furnishing cars.

Whether the remedy provided in the act of 1905 is exclusive of any other mode of procedure for the collection of damages arising from a breach of the carrier's general duty to furnish cars for the transportation of freight, or whether it is cumulative of the common-law remedy, or whether there may be an election, is not a matter which now requires consideration.

The first question, as to whether the rule of the railroad commission quoted is violative of the clause of the constitution vesting the legislative power of the State in the General Assembly, is answered in the negative.

2. From what has already been said it follows that the question

as to whether rule 9 of the railroad commission is invalid on the ground that the commission had no power or authority to adopt it, or that it was adopted by the commission without express power, must be answered in the negative.

3. The act of 1905 is not unconstitutional on the ground that the body of the act purports to confer power on the railroad commission to impose penalties, and the title of the act makes no reference to that subject; or in that the body of the act makes regulations as to the placing of cars, and no reference to that subject appears in its title. The title of the act is as follows: "An act to further extend the powers of the Railroad Commission of this State, and to confer upon the commission the power to regulate the time and manner within which the several railroads in this State shall receive, receipt for, forward and deliver to its destination all freights of every character, which may be tendered or received by them for transportation; to provide a penalty for non-compliance with any and all reasonable rules, regulations, and orders prescribed by the said commission in the execution of these powers, and for other purposes." This outlines with sufficient clearness the scope and purpose of the act, and it is not necessary that the title should set forth all the details of the act necessary to effectuate such purpose. To require this to be done would be substantially to repeat the act in its title. *Black* v. *Cohen,* 52 *Ga.* 621; *Goldsmith* v. *Rome Railroad Co.,* 62 *Ga.* 478; *Halleman* v. *Halleman,* 65 *Ga.* 476; *McCommons* v. *English & Co.,* 100 *Ga.* 653 (28 S. E. 386); *Butner* v. *Boifeuillet,* 100 *Ga.* 743 (28 S. E. 464); *Mayor and Council of Macon* v. *Hughes,* 110 *Ga.* 795 (36 S. E. 247).

4. . The next question propounded by the Court of Appeals is whether the "rule of the railroad commission requiring cars for intrastate shipments" imposes a burden upon interstate commerce, "for the reason that it has the effect of withdrawing equipments necessary to take care of the company's interstate business, and is therefore void as being violative of" the provision of the constitution of the United States, which confers upon Congress the power to regulate commerce among the several States; and, as applied to an-intrastate shipment, is it void because of the general terms employed, which might be broad enough to embrace all cars, whether for interstate or intrastate shipment? The State through its lawful agencies can make reasonable regulations for the management of

railroads operating within its jurisdiction.     The mere fact that
the railroad company may also be engaged in interstate commerce
does not exempt it from regulation by the State as to its intrastate
business.     The rule now under consideration—certainly as to in-
trastate business, which is the subject of the question propounded—
is not in conflict with the provision of the constitution of the
United States to which reference has been made above; nor would
it be so, even if it indirectly or incidentally affected to a limited de-
gree the interstate business of the company, where it does not di-
rectly burden interstate commerce.     *Southern Ry. Co.* v. *Grizzle,*
131 *Ga.* 287 (62 S. E. 177); *Southern Ry. Co.* v. *Brown,* 131 *Ga.*
245 (62 S. E. 177); *Seale* v. *State,* 126 *Ga.* 644 (55 S. E. 472);
*Hennington* v. *State,* 90 *Ga.* 396 (17 S. E. 1009); *Hennington* v.
*Georgia,* 163 U. S. 299 (16 Sup. Ct. 1086, 41 L. ed. 166); Gladson
v. Minnesota, 166 U. S. 427 (17 Sup. Ct. 627, 41 L. ed. 1064);
Southern Ry. Co. *v.* King, 160 Fed. 332 (87 C. C. A. 284); Louis-
ville & Nashville R. Co. *v.* Kentucky, 183 U. S. 503 (22 Sup. Ct.
95, 46 L. R. A. 298); People *v.* Chicago, Indianapolis & Louisville
Ry. Co., 223 Ill. 581 (79 N. E. 144); State *v.* Atlantic Coast Line
R. Co. (Fla. 1908), 47 So. 969, supra; *Southern Flour and Grain
Co.* v. *Northern Pacific Ry. Co.,* 127 *Ga.* 626 (56 S. E. 742, 9 L. R.
A. (N. S.) 853, 119 Am. St. R. 356).     The case of Houston &
Texas Central R. Co. *v.* Mayes, 201 U. S. 329 (26 Sup. Ct. 491, 50
L. ed. 772), was relied on.     But the decision in that case referred
to interstate shipments, and the Texas act expressly limited the de-
fenses which could be made in a suit based on it.     By a majority
of the Supreme Court that act was held invalid, though near to the
line of legitimate regulation.     The Georgia act contains no such
provision; nor is it necessary for its constitutionality that it should
on its face catalogue what defenses are open to the defendant in a
suit to recover the amount fixed by the rule of the railroad commis-
sion.     If an act can be construed so as to be constitutional, or so as
to be unconstitutional, the former construction will be preferred.
*County of DeKalb* v. *City of Atlanta,* 132 *Ga.* 727 (65 S. E. 72).
Whether or not the rule would be subject to attack, if applied to
interstate shipments, is not in question.     It has a legitimate ap-
plication to intrastate business, and so applied is not unconstitu-
tional for the reason involved in this question.     Even if a regula-
tion would be invalid as applied to interstate commerce, it does not

follow that it is so as to intrastate business. Kehrer *v.* Stewart, 197 U. S. 60 (25 Sup. Ct. 403, 49 L. ed. 663). On the face of this act and rule, as applied to intrastate shipments at least, there is no direct regulation or burden on interstate commerce. The arguments of possible inconvenience, possible need for cars elsewhere, etc., can not prevail. Intrastate commerce can not be regulated by the Federal government. If it can not be regulated by the State authorities because of fear or possibility of some hypothetical inconvenience in regard to the interstate business of the carrier, then the intrastate business of a railroad which traverses two or more States is practically free from any regulation.

5. Was the act of 1905 so far repealed by the act of August 23, 1907 (Acts 1907, p. 72), as to render not enforceable "penalties" (pecuniary liabilities) which had accrued to a shipper under the rule of the railroad commission prior to the passage of the latter act, but which had not been presented to the railroad commission in accordance with section 3 of the act of 1905 until August 24, 1907? While some of the language employed in the 11th section of the act of 1907 is apparently quite broad, yet, upon careful consideration, we are of the opinion that it did not wholly repeal the act of 1905, so as to revoke the power to make the rule which we have been considering, but only repealed the last two sections of that act. Repeals by implication are not favored. In the caption of the act of 1907 the intention in regard to the act of 1905 is thus expressed: "to repeal sections 3 and 4 of the act approved August 23, 1905, prescribing certain penalties and forms of procedure for enforcing same." The 11th section of the later act declares that "section 3 and 4 of the act approved August 23, 1905, conferring upon the commission the power to regulate the time and manner within which the several railroads of the State shall receive, receipt for, forward and deliver to its destination freight, the said sections applying to penalties placed upon said railroad companies, providing penalties for the violation of rules, orders, and regulations established by the railroad commission with reference to the same and providing the procedure to enforce said penalties, be and the same are hereby repealed," etc. It was sections 3 and 4 of the act of 1905 which were repealed. The descriptive terms, "conferring upon the commission the power to regulate the time and manner in which the several railroads of the State shall receive, receipt for,

forward and deliver to its destination freight," referred to the act of 1905 and were descriptive of it, and were probably added to avoid repealing a part of an act merely by reference to the date of the act and the sections thereof. This is made manifest by the fact that after this general reference to the act, in returning to a description of the sections repealed, it was said, "the said sections applying," etc. Thus, both from caption and the body of the act of 1907, it appears that only sections 3 and 4 of the act of 1905 were repealed. Sections 1 and 2 conferred the power to make the rule. Neither of them was repealed. The repeal of section 4 clearly did not affect the antecedent portion of the act. The repeal of section 3 withdrew the provision for a hearing before the commission, but did not destroy the power conferred by the preceding portion of the act upon the commission to make the rule, or prevent suit from being brought for the amount named in such rule. Instead, the repeal of section 3 simply left the plaintiff to bring suit directly for the amount fixed by the rule, without any preliminary hearing before the commission. The fifth question certified by the Court of Appeals is therefore answered in the negative.

Some other questions were argued in the briefs of counsel for the railway company. But what we have already said answers all the questions propounded to us by the Court of Appeals, and we confine ourselves to them.

FISH, C. J., dissenting. I fully appreciate the force of the maxim that an act of the legislature should not be declared unconstitutional unless the conflict between the act and the fundamental law be clear and palpable. I have no doubt, however, as to the unconstitutionality of rule nine of the railroad commission of this State; as, to my mind, it is manifestly an attempt on the part of the commission to exercise a legislative power by virtue of the act of 1905, which the General Assembly could not lawfully delegate. Accordingly, under the mandate of the constitution (Civil Code, §5733) that the judiciary shall declare unconstitutional acts void, I am constrained to dissent from the views entertained by my learned associates as to the validity of rule nine of the commission.

The oft-quoted language of Judge Cooley on the subject of the delegation of legislative power may be aptly repeated. He says: "One of the settled maxims in constitutional law is, that the power

conferred upon the legislature to make laws can not be delegated by that department to any other body or authority. Where the sovereign power of the State has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed. The power to whose judgment, wisdom, and patriotism this high prerogative has been intrusted can not relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom, and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust." Cooley's Const. Lim. (7th ed.) 163. In 1 Lewis's Sutherland on Stat. Const (2d ed.) §87, it is said: "The power to make laws for a State vested in the legislature is a sovereign power, requiring the exercise of judgment and discretion. It is a delegated power,—delegated in a constitution by the people in whom inherently are all the powers. On common-law principles, as well as by settled constitutional law, it is a power which can not be delegated." Many adjudications are cited by both of the distinguished authors from whom we have quoted, to sustain the doctrine announced. The decisions in some of such cases, I may say, are in conflict with rulings of this court under similar facts. Some of the earlier cases not in harmony with our decisions have since been overruled by the courts rendering them, the general doctrine, however, being still adhered to. The soundness of the doctrine stated has been frequently recognized by this court. *Mayor etc. of Savannah* v. *Hussey,* 21 *Ga.* 89 (68 Am. D. 452) ; *Grinad* v. *State, 34 Ga.* 270, 274; *Mayor etc. of Brunswick* v. *Finney,* 54 *Ga.* 317 326; *McMahon* v. *Mayor etc. of Savannah,* 66 *Ga.* 217, 224 (42 Am. R. 65) ; *Georgia Railroad* v. *Smith,* 70 *Ga.* 694; *Central Georgia Co.* v. *Exchange Bank,* 101 *Ga.* 345, 353 (28 S. E. 863) ; *Central Railway Co.* v. *State,* 104 *Ga.* 831, 838 (31 S. E. 531, 42 L. R. A. 518). The remarks of Judge Benning, of a contrary tenor, in *Powers* v. *Inferior Court of Dougherty County,* 23 *Ga.* 80, 81, are obiter.

That legislative power can not be delegated is a general rule; but, like all other rules of the common law, it is flexible, extending as far as the reason and principles on which it is founded go, and ceasing when the reason ceases. It admits of exceptions connected with the principle which supports the rule, or which may be presumed to have been intended by the people who are the original

source of the power. 1 Lewis's Suth. Stat. Const. (2d ed.) §87. Accordingly, it is held that Congress may delegate legislative power to territorial governments. While this is a departure from the general rule, it is consistent with the principles which support the rule; for it is a concession of the right of self-government to those who would otherwise have no voice in making the laws which govern them. Again, all the authorities agree that the power to make local by-laws and regulations may be delegated to municipal corporations. Such delegation is justified on the ground of presumed intention of the people, from the immemorial practice in this country and in England, of creating their local governments. *Mayor etc. of Brunswick* v. *Finney, McMahon* v. *Mayor etc. of Brunswick,* supra. These departures decentralize the governing power; the governed have thus a direct voice in the regulation of their local affairs. 1 Lewis's Suth. Stat. Const. §95; Cooley's Const. Lim. (7th ed.) 165. So, as it has been often held, the legislature may empower the courts to adopt rules of practice.

It is, perhaps, impossible to lay down any hard and fast rule by which it may be certainly and readily determined whether a given law is or is not an unlawful delegation of legislative power. Therefore courts can not be too confident in asserting where the precise limitation is upon the competency of the legislature to delegate its powers. State *v.* Gloucester County, 50 N. J. L. 385, 394 (15 Atl. 272, 1 L. R. A. 86). In Cincinnati etc. Railroad Co. *v.* Commissioners, 1 Ohio St. 77, Judge Ranney stated the distinction between the delegation of legislative and administrative powers, which distinction has been frequently quoted and applied by other judges. He said: "The true distinction . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law." In Lock's Appeal, 72 Pa. 491 (13 Am. R. 716), Justice Agnew said the proper distinction is this: "The legislature can not delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and careful legislation must depend which can not be known to the lawmaking power, and must, therefore,

be a subject of inquiry and determination outside of the halls of legislation."

The constitutional inhibition of the delegation of legislative power does not prevent the grant of power not strictly legislative to agencies created by the legislature to make rules and regulations for the government of a particular subject. And it has been repeatedly held that a statute creating a board of commissioners authorized to supervise the operation of railroads within the State, and to regulate freight, passenger, and warehouse charges, is not unconstitutional as delegating legislative powers. 8 Cyc. 834; 4 U. S. E. (Michie), 290, 291, and cases cited. In creating such a board and investing it with such power, the legislature really, however, enacts the law which governs the subject, but intrusts to the board the execution of that law. For the law the statute must be looked to, as the board can not enact laws, although it may make reasonable rules and regulations where the power to do so is expressly or impliedly conferred by statute. 2 Elliott on Railroads (2d ed.), § 678; 8 Cyc. 830 et seq.; 6 Am. & Eng. Enc. L. (2d ed.) 1029; *Georgia Railroad* v. *Smith, 70 Ga.* 694. The constitution of this State, art. 4, sec. 2, par. 1 (Civil Code, § 5797), declares: "The power and authority of regulating railroad freights and passenger tariffs, preventing unjust discriminations, and requiring reasonable and just rates of freight and passenger tariffs, are hereby conferred upon the General Assembly, whose duty it shall be to pass laws, from time to time, to regulate freight and passenger tariffs, to prohibit unjust discriminations on the various railroads of this State, and to prohibit said roads from charging other than just and reasonable rates, and enforce the same by adequate penalties." In 1879 (Acts 1878-9, p. 125) the General Assembly passed an act for the purpose of carrying out the above-quoted provisions of the constitution. By that act the railroad commission was established and its powers and duties defined. The act required the commission to make reasonable and just rates of freight and passenger tariffs, and charges for the use of cars, to be observed by all railroad companies doing business in this State on the railroads thereof, and to make reasonable and just rules and regulations, to be observed by such companies, as to charges for necessary handling and delivery of freights, and for preventing unjust discriminations and the giving or paying of rebates. The

act provided that if any such railroad company should charge, collect, demand, or receive more than a fair and reasonable rate of toll or compensation for the transportation of passengers, freight, or for the use and transportation of any railroad car, it should be guilty of extortion and punished as prescribed by the act. Punishment was also prescribed for unjust discriminations, and for any violation of the rules and regulations provided and prescribed by the commission, the penalty for each offense to be not less than one thousand dollars nor more than five thousand dollars, to be fixed by the presiding judge, the action for the recovery of the penalty to be in the name of the State and instituted by the commission. Civil Code, §2185, et seq. There was nothing in the act authorizing the commission to prescribe a punishment, or penalty or monetary liability, for the violation of any rule or order which it might adopt. In 1882 the case of *Georgia Railroad* v. *Smith,* 70 *Ga.* 694, was brought to this court. There the railroad company denied the power of the commission to regulate freight and passenger tariffs over its road, on the grounds, among others, because, (1) under the constitution the duty was imposed on the General Assembly to regulate freight and passenger tariffs, and (2) the act of 1879 establishing the railroad commission was unconstitutional and void, as being an attempt to delegate legislative powers to the commission. In delivering the opinion, Justice Crawford said: "The object of the constitutional provision and the legislative enactment was to give proper protection to the citizens against unjust rates for the transportation of freights and passengers over the railroads of the State, and to prevent unjust discriminations, even though the rates might be just. It was not expected that the legislature should do more than pass laws to accomplish the ends in view. When this was done, its duty had been accomplished. All laws are carried into execution by means of officers appointed for that purpose; some with more, others with less; but all must be clothed with power sufficient for the effectual execution of the law to be enforced. Legislative grants of power to the officers of the law to make rules and regulations which are to have the force and effect of laws are by no means uncommon in the history of our legislation." He then referred to the power conferred upon the Justices of the Supreme Court and judges of the superior courts to establish rules for such courts. He

also pointed out the impossibility of the legislature entering into the details of fixing freight and passenger tariffs over all the railroads of the State, and, on the question as to the delegation of legislative power, concluded as follows: "In our judgment, the act creating the railroad commission is not unconstitutional and void. . . The difference between the power to pass a law and the power to adopt rules and regulations to carry into effect a law already passed is apparent and strikingly great, and this we understand to be the distinction recognized by all the courts as the true rule in determining whether or not in such cases a legislative power is granted. The former would be unconstitutional, whilst the latter would not." The case of People *v.* Harper, 91 Ill. 357, was cited, wherein it was held that the authority granted by the ·legislature to .a board of railroad and warehouse commissioners to fix the rates of charges for the inspection of grain and compensation of the inspectors was not an unwarrantable delegation of legislative power. The case of Tilly *v.* Savannah etc. Railroad Co., 5 Fed. 641, was also cited, wherein the point was made that the act of the General Assembly of this State, establishing a railroad commission, and authorizing it to fix just and reasonable maximum rates for the railroad companies doing business in this State, was unconstitutional because it conferred legislative power upon the commission. It was there held that the act was not unconstitutional, on this or any other ground urged; and the court cited the rule laid down by Judge Ranney in Cincinnati etc. Railroad Co. *v.* Clinton County, 1 Ohio St. 77, as to the distinction between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and the conferring of the authority or discretion as to its execution, to be exercised under and in pursuance of the law; the first of which can not be done, whilst to the latter no valid objection can be made. It appears, therefore, that the soundness of this rule declaring the distinction between powers delegable and powers non-delegable by the legislature was expressly recognized by this court in the case of *Georgia Railroad* v. *Smith,* 70 Ga. 694, and the ruling there made, upholding the constitutionality of the act authorizing the commission to fix reasonable and just rates, was based upon the rule that the legislature can delegate to a commission the power to adopt rules and regulations to carry into effect a legislative enactment already

passed. The following language was used in the headnotes to that case: "The railroad commissioners are officers appointed to carry into execution the laws passed by the legislature. . . The powers of the railroad commissioners are not legislative." That the legislature can not delegate to a commission the power to make the law, which necessarily involves a discretion as to what it shall be, was also expressly declared in that case, and the rule has been uniformly recognized by this court and all other courts, so far as my information goes. The question now under consideration in the case at bar is not whether the legislature can constitutionally grant power to an agency created by it to make rules and regulations for the government of a particular subject, and the legislature itself prescribe a penalty or liability for the violation of such rules and regulations as may be adopted by such agency, to be enforced in the courts; but the point is, can the legislature constitutionally empower such an agency to make rules and regulations for the government of a particular subject and also authorize the agency itself to prescribe a penalty or pecuniary liability for the violation of the rules and regulations it may adopt? In the opinion Justice Lumpkin endeavors to demonstrate that the one dollar per car per day imposed on a railroad company for a violation of the rule is not a penalty, or at least not a penalty in the strict sense of the word. In the very question certified by the Court of Appeals on this subject, one of the inquiries is whether the rule is unconstitutional "because the prescribing of the penalties therein referred to by the railroad commission of Georgia was an attempt on the part of said body to legislate," etc. Rule nine of the commission requires a railroad company, upon written application therefor, to furnish a car or cars to a shipper, within four days (Sundays and legal holidays excepted) from seven o'clock a. m. of the day following the receipt of such application, and declares that "For a violation of this rule the railroad company at fault shall, within thirty days after demand in writing therefor, pay to the shipper so offended the sum of one dollar per car per day, or fraction of a day, after the expiration of free time, during which each violation continues." The act of 1905, under which the commission claims power to adopt the rule in question, declares: "That whenever a shipper or consignor shall require of a railroad company the placing of a car or cars to be used in car-load shipments, then,

in order for the consignor or shipper to avail himself of *the forfeitures or penalties prescribed by the rules and regulations of said railroad commission,* it must first appear that such shipper or consignor made written application for such car or cars to said railroad; provided further, that such railroad commission shall, by reasonable rules and regulations, provide the time within which said car or cars shall be furnished after being ordered as aforesaid, and *the penalty per day per car* to be paid by said railroad company in the event such car or cars are not furnished as ordered; and provided further, that, in order for any shipper or consignor to avail himself of *the penalties provided by the rules and regulations of said railroad commission,* such shipper or consignor shall likewise be subject, under proper rules to be fixed by said commission, to the orders, rules, and regulations of said railroad commission." The third section of the act provides: "That before any railroad company is *subjected to the penalties* provided by this act, said railroad commission shall require said railroad company to show cause therefor;" etc. (Italic mine.) It is apparent, therefore, that the commission, by the rule in question, not only imposes upon railroad companies the public duty of furnishing a car or cars to shippers within a given time, but itself prescribes a fixed pecuniary liability, repeatedly referred to in the act of 1905 as a *penalty,* to be paid by the railroad companies for a violation of the rule. Why is not the one dollar per car per day imposed on a railroad company for failure to perform the duty prescribed by the commission as much a penalty as the "penalty of one hundred dollars" which the act of 1887 (Acts 1887, p. 111) gave either the sender of a dispatch, or the person to whom it was directed, the right to recover from telegraph companies for failure to transmit a dispatch with impartiality, good faith, and with due diligence? The act of 1887 was held to be penal in its nature, and therefore to be strictly construed. *Langley* v. *W. U. Telegraph Co.,* 88 *Ga.* 777 (15 S. E. 291); *W. U. Telegraph Co.* v. *Ryals,* 94 *Ga.* 336 (21 S. E. 573). In *W. U. Telegraph Co.* v. *Taylor,* 84 *Ga.* 408 (11 S. E. 396, 8 L. R. A. 189), it was held that "The penalty [in act of 1887] is for the wrongful violation of a public duty, and neither in whole nor in part for a mere breach of contract." The same ruling was made in W. U. Telegraph Co. *v.* Pendleton, 95 Ind. 12 (48 Am. R. 692), in construing a similar

statute, and therefore that justice's courts had no jurisdiction of an action for such penalty. And in *Woodburn* v. *W. U. Telegraph Co.,* 95 *Ga.* 808 (23 S. E. 116), it was held, that an action for the penalty under the act of 1887 abated after the repeal of the act. To same effect *W. U. Telegraph Co.* v. *Lumpkin,* 99 *Ga.* 647 (26 S. E. 74), and case cited. It is said in the majority opinion that the act of 1887 "was different in its character from that now being discussed." The only differences suggested are that the act of 1887 gave either the sender or the person to whom the telegram was directed the right to recover the penalty, whichever might first sue, and that it was provided that nothing in the act should be construed as impairing the right of any person to recover damages for a breach of contract or duty of the company. Surely the mere fact that either the sender or the person to whom the message was directed could recover the penalty under the act of 1887 can not be a sound reason for holding that such act provided for the recovery of a penalty, whilst the right of recovery, under the rule of the commission, of the one dollar per car per day for a violation of such rule is not for a penalty because it is limited to the offended shipper. The liability in such case is imposed for the violation of a public duty; and if the rule of the commission had given the consignee as well as the shipper a right of action for an infraction of the rule, the liability, in my opinion, would be no more nor less a penalty. Nor am I prepared to say that, if the rule under consideration were valid, a recovery of the one dollar per car per day would impair the right of the shipper to recover damages for a breach of contract or duty of the railroad company. To so hold might in effect be a ruling that the rule of the commission repeals a common-law right of the shipper. As the act of 1887 and that of 1905 both expressly designate the liability, respectively provided for, as a penalty, I am unable to comprehend why it is not as much a penalty in the one act as in the other. There are various sections of the Civil Code imposing penalties upon railroad companies for failure to perform specified public duties. The legislature specifically denominated such liabilities as penalties, and I assume that they were meant to be such. Section 2281 provides for the recovery by a passenger of a penalty of fifty dollars for the failure of the railroad company to check his baggage. Sections 2299 and 2300 make it the duty of railroad companies to sell

tickets of and to connecting roads, and section 2301 prescribes a penalty for refusing so to do, to be recovered by the company whose road may be discriminated against or by the person offering to purchase a ticket, and provides that "such penalty may be recovered by each of said parties, and the recovery by one shall not be a bar to recovery by the other." Section 2209 provides for the recovery, by one paying overcharges for storage, of "the same penalties and measure of damages as is provided in the case of overcharges of freight rates." Section 2244 gives a landowner the right to recover of a railroad company twenty-five dollars a day for the company's failure, after notice prescribed, to build cattleguards; and in *Alabama etc. R. Co.* v. *Fowler,* 104 *Ga.* 148 (30 S. E. 243), it was held that this section "being a statute authorizing the recovery of a penalty, it should be strictly construed." And section 2251 declares that railroad companies shall be liable for the "penalty" imposed by section 2250 on their overseers or trackmenders for failure to file reports of stock killed on the railroad, where such overseer or track-mender is insolvent. The case of Huntington v. Attrill, 146 U. S. 657 (13 Sup. Ct. 224, 36 L. ed. 1123), is cited and quoted from in the majority opinion, for the purpose of showing the strict and primary meaning of the words "penal" and "penalty." The question in that case was whether a statute of the State of New York (Laws 1875, c. 611, §§21, 37), making the officers of a corporation, who sign and record a false certificate of the amount of its capital stock, liable for all its debts, is a penal law within the strict, primary, and international sense, so as to bring it within the rule forbidding the penal laws of one country to be enforced in any other country. It was held, in effect, that as criminal laws, that is to say, laws punishing crimes, constitute the whole class of penal laws which can not be enforced extra-territorially, the statute in question was not a penal law in the international sense. Justice Gray in his opinion said (and his language is quoted by Justice Lumpkin) : "Strictly and primarily, they [the words "penal" and "penalty"] denote punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offense against its laws. . . But they are also commonly used as including any extraordinary liability to which the law subjects a wrong-doer in favor of the person wronged, not limited to the damages suffered. . . Statutes giving a private

action against the wrong-doer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal." He further said, in reference to the statute in question: "As the statute imposes a burdensome liability on the officers for their wrongful act, it may well be considered penal, in the sense that it should be strictly construed. But as it gives a civil remedy, at the private suit of the creditor only, and measured by the amount of his debt, it is as to him clearly remedial." Statutes of a nature similar to that of New York, making the directors or trustees of corporations, as they are variously called, liable to pay debts of the corporation which have been contracted by them during the period of certain official defaults, have been held by most courts to be penal statutes and therefore to be strictly construed, while some courts have held them to be not penal but remedial in their nature. 3 Thomp. Cor. §4164; 10 Cyc. 852 et seq.; 1 Cook, Cor. (5th ed.) §223, p. 462, n. 2; 21 Am. & Eng. Enc. Law, 882 et seq. Judge Thompson (3 Thomp. Cor. §4165) thinks the better view is that such statutes should not be regarded as creating penalties or as giving actions for penalties, but rather as a measure of security for the public. And he cites *Neal* v. *Moultrie*, 12 *Ga.* 104. In 21 Am. & Eng. Enc. Law, 883 it is said: "The true position is perhaps an intermediate one, that as the statutes impose a burden upon the officers for their wrongful act, they may be considered penal in the sense that they should be strictly construed; but as they give a civil remedy, at the private suit of a creditor, measured by the amount of his debt, they are, as to him, remedial." In *Neal* v. *Moultrie*, 12 *Ga.* 104, cited in the majority opinion, the action was against the directors of a bank upon the personal-liability clause of its charter, providing that the total amount of the debts of the bank should not exceed three times the amount of the stock paid in, over and above the amount actually deposited for safekeeping, and in case of excess making the directors individually liable for the same, as well as their heirs, executors, or administrators, the bank being also liable. The controlling question adjudicated was that the limitation of six months, provided by the act of 1776, as to actions for "any penalty, fine, or forfeiture whatsoever," "inflicted or imposed by any act of the General Assembly," did not apply to the action against the directors. It is

true that it was held: "that in all cases where a statute creates a right of action and recovery in individuals, or a particular class of individuals, such statute is not penal, but remedial." · In the opinion some stress was placed upon the facts that the act did not designate the liability as a penalty or forfeiture, and that it made not only the directors themselves but their executors or administrators subject to the liability. Judge Nisbet, delivering the opinion, said: "There is no designation of the liability for the excess as a fine, a forfeiture, or a penalty. It may be presumed that if the legislature had intended to inflict a fine, to create a forfeiture, or to provide a penalty, they would have used language clearly expressive of such a purpose. They have said nothing whatever about a fine, a penalty, or a forfeiture." "They have said that in case of excess the directors shall be liable, . . in their individual . . capacity; that an action of debt may be brought against them, . . not only against *them,* but against their *executors or administrators* (plainly indicating the excess to be a debt chargeable upon their estates), and that this action may be brought and prosecuted by any creditor or creditors of the corporation. Now here is, with clearness and precision, the liability declared, the persons in whose favor the directors are liable, and the remedy by which the liability is to be enforced. From the terms of this rule, I say, then, that it is difficult, if not impossible, to come to any other conclusion than that it is a remedial provision, designed to protect any creditor against loss by reason of an excess of debts." In *Banks* v. *Darden,* 18 *Ga.* 318, 341 where the liability of the directors and stockholders of a bank with a charter similar to that involved in 12 *Ga.* 104, was up for adjudication, Judge Lumpkin delivering the opinion said: "that the individual liability of the directors and of the stockholders, under the charter, is ·not strictly a contract, although, from convenience, it is frequently called so; but it is an obligation, quasi ex contractu, which is imposed by operation of mere law. The State passes a law— the law of incorporation of the Planter's and Mechanic's Bank. This law, unlike public law, is binding upon no one until some one voluntarily assents to make it the rule of his conduct. The stockholders, in accepting the charter, and the directors, when elected, made it, for themselves, a rule of conduct. By the issue of more than three dollars to one, the directors committed an illegal—a

tortious act, and made themselves personally liable to the plaintiff for a breach of duty, because he was a creditor of the corporation.   And an action *quasi ex contractu* is raised in his favor against the directors.   This is a statute liability—it is *quasi ex contractu*—but it can not be called technically a contract; it need not be proved as contracts between parties must be."   In *Hargroves* v. *Chambers, 30 Ga.* 580, 603, in referring to the liability of the directors under the same charter considered in 18 *Ga.* 318, Judge Lyon, speaking for the court, said: "The liability of these defendants is not a penalty, and so adjudged in all the cases. *Banks* vs. *Darden, 18 Ga.* 318. But it is a right vested in the plaintiff at the time of making the contract with the bank, as an incident to that contract and a security for its performance."   So in Bell *v.* Farmell, 176 Ill. 489 (52 N. E. 346, 42 L. R. A. 804, 68 Am. St. R. 194), cited in the majority opinion, it was held:   "If a statute provides that stockholders of corporations shall be liable to their creditors, such liability must be regarded as contractual and not as penal."   In the opinion the court, quoting from Diversy *v.* Smith, 103 Ill. 378 (42 Am. R. 14), said: "'But the statute under consideration . . prohibits the making of all contracts.   It imposes the liability upon the trustees and corporators, not because the company was authorized to contract in their names or on their behalf, or so as to otherwise bind them, but because it prohibited the commencement of business and issuing of policies, and the trustees and corporators, in violation of their duty, caused or permitted business to be commenced and policies to be issued.'   Sedgwick says: 'Penal statutes are acts by which a forfeiture is imposed for transgressing the provisions of the act.'   He moreover adds:   'A penal law may also be remedial, and a statute may be remedial in one part and penal in another.'   In Potter's Dwarris on Statutes, 74, it is said: 'A penal statute is one which imposes a forfeiture or penalty for transgressing its provisions or for doing a thing prohibited.'   It is the effect, not the form of the statute that is to be considered; and when its object is clearly to inflict a punishment on a party for violating it—i. e., doing what is prohibited or failing to do what is commanded to be done—it is penal in its character.'   In the decision the distinction between a penal and a contractual liability is made.   In the one case the liability arises by a violation of the law.   But where the statute

declares that the corporation may transact business and the stockholders shall be liable for debts contracted, then the liability is primary and based upon contract." A somewhat similar view of statutes as to the liability of directors was taken in Fitzgerald v. Weidenbeck, 76 Fed. 695, where it was in effect held that they should not be construed as penal, but as simply presenting a case where the grant of a franchise to be personally exempt from the indebtedness which the grantees contract in their own behalf is made with a qualification which reads itself into the grant. See 10 Cyc. 853.

Unlike the statute involved in *Neal* v. *Moultrie*, 12 *Ga.* 104, wherein there was no designation of the lilability as a forfeiture or a penalty, the act of 1905, under which it is claimed the commission has authority to require railroad companies to furnish a car within a given time, and on failure to do so that the offending company, under the rule of the commission, is liable for one dollar per car per day, expressly designates such liability as a forfeiture or penalty, and it is not measured by the amount of any debt as the liability referred to in that case was said to be. Again, "the forfeitures or penalties prescribed by the rules and regulations of said railroad commission" are not obligations *quasi ex contractu.* The railroad companies chartered and doing business prior to the act of 1905 and the adoption of rule nine of the commission did not voluntarily assent to make it the rule of their conduct. Ever since the adoption of the Code of 1863 (§2042) there has been in all our codes a section declaring that "A common carrier, holding himself out to the public as such, is bound to receive all goods and passengers offered that he is able and accustomed to carry, upon compliance with such reasonable regulations as he may adopt for his own safety and the benefit of the public." The commission, under the act of 1905, substituted its own regulation as to furnishing cars for the regulation that the carrier previously had the right to adopt; and it can not be said that such carrier voluntarily assented to make the regulation of the commission the carrier's rule of conduct. I am unable to comprehend how "the forfeitures or penalties prescribed by the rules and regulations" of the commission flow from any contractual relation between the shipper and the railroad company. The liability imposed upon the railroad company is not of the same nature as the liability im-

posed upon directors and stockholders of corporations, which, as was said in 30 *Ga.* 603, is a right vested in the creditor at the time of making the contract with the bank, as an incident to that contract and a security for its performance, or, as it was in effect denominated, a quasi contracted liability, in 18 *Ga.* 341; but in my opinion the liability imposed upon a railroad company for failure to do what the rule of the commission requires is as much a penalty as to the company for failure to perform a public duty prescribed by the rule of the commission, as the liability imposed by the act of 1887 upon telegraph companies for failure to perform a public duty prescribed by that act was a penalty, as it was held to be by many decisions of this court. The rule imposes a burdensome liability on railroad companies, not by reason of any agreement or contract on their part, but solely as a punishment for their neglect or misconduct as to a public duty prescribed by the commission; and in this sense the liability is, to my mind, penal in its nature as respects the companies, and not contractual. When the commission adopts the regulation and itself prescribes a rule which subjects the railroad companies to a fixed pecuniary liability for an infraction of such regulation, it performs a strictly legislative function, the substance of the legislation being found in that part of the rule which prescribes punishment for disregard of the regulation so determined. In Chicago & N. W. Ry. Co. *v.* Dey, 35 Fed. 866, 874 (1 L. R. A. 744), from which there is a quotation in the majority opinion, the action was to enjoin the railroad commissioners of the State of Iowa from putting in force a certain schedule of rates proposed by them for all transportation within the limits of the State. The question as to whether commissioners could impose a liability for the violation of such schedule was not involved. Judge Brewer, in delivering the opinion, said: "While, in a general sense, following language of the Supreme Court, it must be conceded that the power to fix rates is legislative, yet the line of demarkation between legislative and administrative functions is not easily discerned. The one runs into the other." It was held, however, that the statute authorizing the commission to make a schedule of railroad charges was not unconstitutional as an attempted delegation of legislative power, following the decisions in what is known as the Granger cases, 94 U. S. 113, 137 (24 L. ed. 77). As was done in *Georgia Railroad* v. *Smith,* 70 *Ga.* 694,

the decision in 35 Fed. 866, was based largely upon the rule of ex necessitate; for Judge Brewer said: "The reasonableness of a rate changes with the changed condition of circumstances. That which would be fair and reasonable to-day, six months or a year hence may be either too high or too low. The legislature convenes only at stated periods; in this State only once in two years. Justice will be more likely done if this power of fixing rates is vested in a body of continual session than if left with one meeting only at stated and long intervals. Such a power can change rates at any time, and thus meet the changing conditions of circumstances." It appears to me to be clear that the rule of necessity and the argument of inconvenience will not apply so as to justify the exercise of the legislative function of the commission in prescribing the liability of one dollar per car per day for failure to comply with the regulation adopted by that body, for the reason that the legislature in its wisdom and judgment could have readily determined for itself, without the aid of the commission, what would be a reasonable liability to be imposed on a railroad company for violating the regulation of the commission as to furnishing cars. I do not perceive that changed conditions of circumstances, occurring between the annual sessions of our General Assembly, would likely render the amount of such liability fixed at one session unfair and unreasonable before that body should again convene. In the cases of *Neal* v. *Moultrie,* 12 *Ga.* 104, *Banks* v. *Darden,* 18 *Ga.* 318, and *Wheatley* v. *Glover,* 125 *Ga.* 729 (54 S. E. 626), cited in the majority opinion, it was held that the liability of directors and stockholders of corporations is a statute liability—that is, one imposed by operation of law. Of course it requires a legislative act to create a statutory liability. When the legislature delegates to the commission power to adopt a rule or regulation and also to prescribe a fixed liability for the infraction of such rule or regulation, then it must be that such a liability is a commission-rule liability— that is, one created by the commission under the authority delegated to it by the legislature so to do, and the commission thus exercises a legislative function.

Suppose that the liability for a violation of such rule is not a penalty, or penal in its nature, but is a civil demand, monetary obligation, or "reciprocal demurrage," so that it does not come within the scope of the rulings made in many cases that penal laws

are peculiarly within the power of the legislature to enact, why is not the fixing by the commission of the liability, whatever it may be called, for a violation of its own rule, legislation in a strict sense? Is the passage of a civil law any less a legislative act than the passage of a criminal law? As to the exercise of a legislative function what difference in principle exists between the two cases? If the General Assembly can not delegate to the commission power to adopt a rule or regulation requiring railroads to furnish a prospective shipper a car within a given time, and to authorize the commission to prescribe a fixed amount as a forfeiture or penalty (as the act of 1905 denominates it) "for a violation of this rule" (the language of rule nine), because this would be penal legislation and peculiarly a function to be performed by the General Assembly itself, I am not able to understand why it is not as much a delegation of legislative power to authorize the commission to adopt such a rule and to prescribe a liability to be paid for failure to comply with the same. The fact that the fixing of such liability by the commission may be termed, by those contending for the validity of the rule, a mere regulation whereby the liability imposed is a civil demand, monetary obligation, or "reciprocal demurrage," does not furnish to my mind a sound distinction between the two cases. In either case it is, in my opinion, an attempt on the part of the General Assembly to relinquish a high prerogative conferred upon it by the sovereign power of the State, and to be exercised in accordance with its own judgment, wisdom, and patriotism, to another body, which this court has in effect held is a mere administrative or executive body, possessing no legislative power beyond the authority to adopt (and this from the necessity of the case) rules and regulations to carry into effect a law already passed by the legislature. *Georgia Railroad* v. *Smith,* 70 *Ga.* 694. In none of the cases cited in the opinion of the majority of the court, as illustrations of powers which it has been held that Congress or a legislature can lawfully delegate, can I find that it has been decided that such legislative bodies can lawfully delegate to some other body or official the power to adopt rules and regulations and to prescribe a forfeiture, penalty, or monetary liability for the violation of such rules or regulations, unless it be in the two cases decided by the Florida court. I will proceed to make some reference to such cases. In the case of Aurora, 7 Cranch, 382 (3 L. ed.

378), it was held that Congress may make the revival of an act depend upon a future event, and direct that event to be made known by a proclamation of the president. There Congress "only prescribed the evidence which should be admitted of a fact, upon which the law should go into effect." The court said: "We can see no sufficient reason why the legislature should not exercise its discretion in reviving the act of March 1, 1809, either expressly or conditionally, as their judgment should direct. The 19th section of that act, declaring that it should continue in force to a certain time, and no longer, could not restrict their power of extending its operation without limitation upon the occurrence of any subsequent combination of events." It has been many times held that the legislature may provide that an act may become operative upon the happening of a future event. In Field v. Clark, 143 U. S. 649 (12 Sup. Ct. 495, 36 L. ed. 294), it was held by the majority of the court, that the tariff act of 1890, conferring authority upon the president to reduce the revenue and equalize duties on imports and to suspend by proclamation the free introduction of sugar, molasses, coffee, tea, and hides, when he is satisfied that any country producing such articles imposes duties or other exactions upon the agricultural or other products of the United States, which he may deem to be reciprocally unequal or unreasonable, is not open to the objection that it unconstitutionally transfers legislative power to the President. Justice Harlan, speaking for the majority of the court, said: "That Congress can not delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution. The act of October 1, 1890, in the particular under consideration, is not inconsistent with that principle. . . Congress itself prescribed, in advance, the duties to be levied, collected, and paid, on sugar, molasses, coffee, tea, or hides, produced by or exported from each designated country, while the suspension lasted. Nothing involving the expediency or the just operation of such legislation was left to the determination of the President. The words 'he may deem,' in the third section, of course, implied that the President would examine the commercial regulations of other countries producing and exporting sugar, molasses, coffee, tea, and hides, and form a judgment as to whether they were reciprocally equal and reasonable, or the contrary, in their effect

upon American products.   But when he ascertained the fact that duties and exactions, reciprocally unequal and unreasonable, were imposed upon the agricultural or other products of the United States by a country producing and exporting sugar, molasses, coffee, tea, or hides, it became his duty to issue a proclamation declaring the suspension, as to that country, which Congress had determined should occur.   He had no discretion in the premises except in respect to the duration of the suspension so ordered.   But that related only to the enforcement of the policy established by Congress.   As the suspension was absolutely required when the President ascertained the existence of a particular fact, it can not be said that in ascertaining that fact and in issuing his proclamation, in obedience to the legislative will, he exercised the function of making laws.   Legislative power was exercised when Congress declared that the suspension should take effect upon a named contingency.   What the President was required to do was simply in execution of the act of Congress.   It was not the making of law. He was the mere agent of the lawmaking department to ascertain and declare the law upon which its expressed will was to take effect.   It was a part of the law itself as it left the hands of Congress that the provisions, full and complete in themselves, permitting the free introduction of sugars, molasses, coffee, tea, and hides, from particular countries, should be suspended in a given contingency, and that in case of such suspensions certain duties should be imposed."   In this connection the distinction between the delegation of power to make the law and the conferring of authority or discretion as to its execution, announced by Judge Ranney in 1 Ohio St. 88, supra, and in Lock's Appeal, 72 Pa. St. 491, supra, is quoted, as well as what was said on the subject in Moers *v*. City of Reading, 21 Pa. St. 188.

In Butterfield *v*. Stranahan, 192 U. S. 470 (24 Sup. Ct. 349, 48 L. ed. 525), it was held, that "Where a statute acts on a subject as far as practicable and only leaves to executive officials the duty of bringing about the result pointed out, and provided for, it is not unconstitutional as vesting executive officers with legislative powers," and that accordingly the act of March 2, 1897 (c. 358, 29 Stat. 604, U. S. Comp. St. 1901, p. 3194), to prevent the importation of impure and unwholesome tea is not unconstitutional upon the ground that the power therein conferred upon the Secre-

tary of the Treasury to establish standards is legislative and can not be delegated by Congress to administrative officers. The court said: "We are of opinion that the statute, when properly construed, . . but expresses the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or presumably so because of their inferior quality. This, in effect, was the fixing of a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute. The case is within the principle of Field v. Clark, 143 U. S. 649" (12 Sup. Ct. 495, 36 L. ed. 294). In Union Bridge Co. v. United States, 204 U. S. 364 (27 Sup. Ct. 367, 51 L. ed. 523), it was held, that "Congress, when enacting that navigation be freed from unreasonable obstructions arising from bridges which are of insufficient height or width of span, or are otherwise defective, may, without violating the constitutional prohibition against delegation of legislative or judicial power, impose upon an executive officer the duty of ascertaining what particular cases come within the prescribed rule." And that "The provisions in §18 of the river and harbor act of 1899, 30 Stat. 1121, 1153, providing for the removal or alteration of bridges which are unreasonable obstructions to navigation, after the Secretary of War has, pursuant to the procedure prescribed in the act, ascertained that they are such obstructions, are not unconstitutional either as a delegation of legislative or judicial power to an executive officer or as taking of property for public use without compensation." The river and harbor act there involved declares, that "If the persons, corporation, or association owing or controlling any railroad or other bridge shall, after receiving notice to that effect, as hereinbefore required, from the Secretary of War, and within the time prescribed by him, wilfully fail or refuse to remove the same or to comply with the lawful order of the Secretary of War in the premises, such persons, corporation, or association shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding five thousand dollars," etc. So the statute itself prescribed the penalty to be imposed for failure to remove a bridge in compliance with the order of the Secretary of War, after he had ascertained the fact that it came within the scope of the statute, and he was not given the power to adopt a rule or to pass an order and to himself

prescribe a penalty or liability for its infraction.    The controlling question decided in the Railroad Commission Cases, 116 U. S. 307 (6 Sup. Ct. 334, 388, 1191, 29 L. ed. 636), was that the statute of the State of Mississippi (Acts 1884, p. 31, c. 23), creating a railroad commission, and conferring upon it the power to make reasonable rules and regulations as to transportation within the limits of the State, does not impair the obligation of the contract contained in the charters of the railroad companies referred to in those cases.    No reference was made to the question as to whether the legislature could constitutionally confer upon a commission the power to make rules for the regulation of transportation and also the authority to prescribe a penalty, forfeiture, or liability for the violation of such rules.    Indeed the Mississippi statute, like the statute of this State creating a commission, did not delegate to the commission power to prescribe a penalty or liability for the violation of its rules or regulations.    Nor was there any reference made to such question in the two Mississippi cases (Stone *v.* Yazoo &c. R. Co., 62 Miss. 607; Stone *v.* Natchez &c. R. Co., 62 Miss. 646) noted by the Supreme Court of the United States.    The latter court said: "The Supreme Court of Mississippi has decided in the cases (the two just cited)  .  . that the statute is not repugnant to the constitution of the State, 'in that it creates a commission and charges it with the duty of supervising railroads.'    To this we agree, and that is all that need be decided in this case."

In Kansas *v.* Missouri Pacific Ry. Co., 76 Kan. 467 (92 Pac. 606), it was held that the statute of Kansas, conferring on a railroad commission power to regulate and control common carriers, delegates to such commission functions administrative in character.    The court quoted from decisions wherein the distinction laid down in 1 Ohio St. 88, and in Lock's Appeal, supra, was approvingly recognized.    In *Phinizy* v. *Eve,* 108 *Ga.* 360 (33 S. E. 1007), it was held: "The forty-first section of the act of September 22, 1881, establishing a city court in the county of Richmond, which provides that the judge thereof shall be ex-officio commissioner of roads and revenues of that county, is not open to attack on the ground that it seeks to confer upon a judicial officer legislative functions," etc. In that case the contention was that the judge of the city court, as commissioner of roads and revenues, was levying the taxes of the county, and that this was an exercise of legislative power.    Presid-

ing Justice Samuel Lumpkin, speaking for the court, said: "If the judge, as county commissioner, exercises a legislative function, he must make a law. The General Assembly makes laws in the shape of statutes or joint resolutions. Judge Eve neither enacts a statute nor agrees to a resolution. He can not make a law nor can he change one. He must levy the taxes according to laws duly passed by the lawmaking power, and not agreeably to laws of his own creation. Every step is prescribed. The General Assembly has declared what are the subjects of taxation; when, how, and by whom, and to whom, returns are to be made; when and by whom the rate must be calculated; and when and by whom and to whom the money must be paid. It has further enacted how the laws on the subject of taxation shall be enforced, and fixed the tax liens. So the General Assembly, by which alone the taxing power can be exercised, has left nothing to be legislated upon by anybody else. There is legislation ample to cover the entire field. But this legislation has come from the lawmaking power, and not from the commissioner of roads and revenues." The other Georgia cases cited in this connection are merely instances of where the statutes involved were of a local nature, and went into effect upon the vote of the locality to be affected.

In Blue v. Beach, 155 Ind. 121 (80 Am. St. 195, 50 L. R. A. 64, 56 N. E. 89), the Supreme Court of Indiana rendered a decision in adjudicating upon a statute creating a State board of health and authorizing it to adopt reasonable rules and regulations for the promotion of the public health. An examination of the statute will show, however, that while such board was vested with the power to make such rules and regulations, it was not given the power to prescribe a penalty or liability for the violation of its rules and regulations (Burns' Revised Statutes of 1894, §§ 6711 et seq.), but the statute itself provided that "the secretary of any board of health, who shall fail or refuse to promulgate and enforce such rules and regulations, and any person or persons, or the officers of any corporation, who shall fail or refuse to obey such rules and regulations, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined," etc. § 6719. And section 6724 provides: "Any person or persons, or the officers of any corporation, who shall violate any of the provisions of this act, shall be deemed guilty of a misdemeanor," etc. The distinctions made in Lock's Appeal, 72

Pa. St. 491·(13 Am. St., R. 716), between the delegation of power to make a law and the delegation of power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend, was approvingly quoted by the court.

In Isenhour *v.* State, 157 Ind. 517 (87 Am. St. R. 228, 62 N. E. 40), the appellant was convicted for a violation of the pure-food law by having in his possession, with intent to sell the same, a certain quantity of milk adulterated as stated. The statute provided that "within ninety days after the passage of this act the board of health shall adopt such measures as may be necessary to facilitate the enforcement thereof, and shall prepare rules and ordinances, where and when necessary, regulating minimum standards of foods and drugs, defining specific adulterations, and declaring the proper methods of collecting and examining drugs and articles of food." It was held that there was not an attempted delegation of legislative power to the State board of health. The court said: "That which is required of the State board of health has no semblance of legislation. It merely relates to a procedure in the law's execution for a reliable and uniform ascertainment of the subjects upon which the law is intended to operate." "The peculiar character of the subject, embracing, as it does, considerations of sanitary science, is such as to require for just legal control something more than legislative wisdom, to designate accurately the subjects and instances intended to be affected. The classification of these subjects, and the prescribing of rules by which they may be determined by a qualified agent, is not legislation, but merely the exercise of administrative power. The law itself is complete in all its parts. In respect to the matters to · be determined by the State board of health in its execution, it awaits the performance of these duties. When performed, the law operates upon the things done by the board. While unperformed, the law remains ready to be applied whenever the preliminary conditions exist."

In Brodbine *v.* Inhabitants of Revere, 182 Mass. 598 (66 N. E. 607), it was held that a statute giving a board of park commissioners authority to make rules and regulations for the government and use of the roadways or boulevards under its care, breaches whereof shall be breaches of the peace, punishable as such in any court having jurisdiction of the same, is not unconstitu-

tional as an attempted delegation of legislative power. There the statute, not the board of commissioners, provided for the punishment of violations of the rules and regulations of the board. The court said: "Apparently on grounds of expediency, amounting almost to necessity, the making of rules and regulations for the preservation of the public health has been intrusted to boards of health in towns as well as in cities, and to a State board of health, and the violation of the rules established by the city or town boards has long been and is now punishable in the courts [citing statutes of Mass.]. The validity of these statutes, which has long been recognized, stands upon one or both of two grounds. They must be considered as being within the principle permitting local self-government as to such matters, the board of health being treated as properly representing the inhabitants in making regulations, which are needed at short notice, and which could not well be made, in all kinds of cases, by the voters in town meeting assembled. Perhaps some of these statutes may also be justified constitutionally on the ground that the work of the board of health is only a determination of details in the nature of administration, which may be by a board appointed for that purpose, and that the substantive legislation is that part of the statute which prescribes a penalty for the disobedience of the rules which they make as agents performing executive and administrative duties."

The act of Congress of August 17, 1894, granting to the Secretary of War authority to prescribe such rules and regulations for the use, administration, and navigation of canals, etc., owned or operated by the United States, as in his judgment public necessity may require, which, in United States v. Ormsbee, 74 Fed. 207, was held not invalid as a violation of legislative power, itself declares that "every person and every corporation which shall knowingly and wilfully violate such rules and regulations shall be deemed guilty of a misdemeanor, and on conviction thereof . . shall be punished by a fine not exceeding five hundred dollars," etc. The Secretary of War is given no power to prescribe a penalty or liability for the violation of such rules and regulations as he may adopt. The cases cited in the opinion of the majority of the court, wherein it is held, in effect, that the legislative recognition of the army and navy regulations must be understood as giving to

these regulations the force of law, do not, in my opinion, militate against the position I have taken in the instant case.

In State *v.* Atlantic Coast Line R. Co. (Fla.), 47 So. 969, an action was brought, under section 2908 of the General Statutes of Florida, 1906, by the railroad commissioners, in the name of the State, to recover penalties fixed and imposed under the railroad-commission law upon railroad companies, for alleged violations of demurrage rule 8 of the commission rules, *in refusing to pay liabilities to a shipper incurred under the rule.* Rule 8 provides that railroad companies should be liable to a shipper in a charge of $1 per day per car for detaining cars properly loaded, with shipping instructions given. The judgment of the trial court, sustaining a demurrer to the declaration, was affirmed by the Supreme Court on the ground that, although "Penalties may be incurred by a railroad company under the statute for the penal violation of prescribed duties peculiar to such companies, . . . *the statute does not provide for incurring a penalty for mere refusal to pay a monetary liability imposed by a rule of the railroad commission.*" (Italics mine.) It is apparent, therefore, that the question whether the legislature can constitutionally delegate to a commission the power to adopt rules for the regulation of the business of railroad companies, and to prescribe a penalty or monetary obligation or liability to be imposed for violations of such rules, was not presented for adjudication in that case, and, as said by Taylor, P. J., who concurred in the judgment, all that is said in the opinion delivered for the majority of the court as to the constitutionality of the rule referred to, and as to the power of the commission to prescribe the liability, is purely obiter dicta. The views of the majority of the court on the subject are, however, forcibly expressed, and perhaps are entitled to as much consideration and weight as if the question were really presented for decision. They expressly recognize the doctrine that legislative power can not be delegated, saying: "The statute does not attempt to give to the railroad commission power to prescribe a duty to be observed by a railroad company as a carrier, and also to provide a penalty as such for a breach of the duty. Such action, if taken, may be considered an attempt to authorize the commission to make a substantial law in violation of the constitution, since prescribing a penalty to be incurred is a legislative function. But the

statute may give and does give the commissioners the authority, and makes it their duty, to prescribe reasonable and just rules and regulations stating the duties of the railroad companies as common carriers, for the breach of which duties the carrier may incur a penalty prescribed by the statute for such breach." The charge of $1 per car per day, referred to by the rule for delaying cars, was said not to be a penalty, but to be a monetary obligation incurred for breach of duty, that may be enforced by the shipper to whom it is due. I must respectfully differ with the learned court in this opinion; for to my mind, as I have already stated, it is the exercise of a legislative function for a commission to adopt a rule or regulation and to prescribe a fixed liability to be imposed for its violation, whether the liability be denominated as a penalty, or in the nature of a penalty, or as a monetary obligation, the substantive legislation being that part of the rule prescribing the liability as a punishment for its violation.

In State v. Seaboard Air-Line Railway (Fla.), 47 So. 986, the action was brought by the railroad commissioners, in the name of the State, to recover a penalty of $1,000, imposed by the commission upon defendant for the violation of freight rule 3 of the commission, which provides that "No railroad company shall decline or refuse to act as common carrier to transport any article proper for transportation; and a failure to transport such article within a reasonable time after the same has been offered for transportation shall be deemed a violation of the rule." The railroad commission act of Florida (General Statutes of Florida, §2882 et seq.) confers upon the commission power to make reasonable and just rates of freight and passenger tariffs, and reasonable and just regulations for the prevention of unjust discriminations, etc., "and to direct and control other matters pertaining to railroads that shall be for the good of the public," and declares that any railroad company violating a rule of the commission shall incur a penalty of not more than $5,000, to be fixed and imposed by the commission, and to be recovered by an action in the name of the State, the fact of the fixing and imposition of such fine by the commission to constitute prima facie evidence of the liability." The rulings made in the case were principally on points of practice or procedure; but in the majority opinion it was said: "In view of the extended discussion in the opinion in the case of State of Florida v.

Atlantic Coast Line Railroad Company (filed this day [47 So. 969]), and the conclusion therein announced, it becomes unnecessary for us to consider the question of the constitutionality of the railroad commission act (Gen. Stat. 1906, §§2882-2925) further than to state that it has not been made to appear to us wherein such act is unconstitutional.   We are also of the opinion, for the reasons stated therein, that the commissioners had the power and authority under such act to make at least that portion of freight rule 3 involved here, and that the same is not invalid or unreasonable."   As the action was in the name of the State to recover the penalty prescribed by the statute itself for a violation of a rule of the commission, it is clear that the question whether the commission could adopt a rule regulating the traffic of railroad companies and itself constitutionally prescribe a penalty or liability to be imposed for its violation was not involved in the case.

Statutes empowering corporate authorities of certain cities to appoint commissioners of pilotage, and conferring upon such commissioners power to prescribe rules and regulations for the government of pilots, to prescribe the fees for their services, and to impose such penalties not inconsistent with law, for neglect of duty, or for a violation of the orders or of the rules and regulations of the commissioners, as they may think proper, can not, in my opinion, be sustained except upon the principle permitting local self government as to such matters, the commissioners being treated as properly representing the inhabitants in making such regulations. See, in this connection, Commonwealth v. Plaisted, 148 Mass. 375 (19 N. E. 224, 2 L. R. A. 142, 12 Am. St. R. 566) ; Brodbine v. Revere, 182 Mass. 598 (66 N. E. 607).